# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| A.N.S.W.E.R. (Act Now to Stop War and End Racism) Coalition 1247 E Street, S.E. Washington, D.C. 20003 | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Case No. 05-71 (PLF) |
| Gale A. Norton, Secretary of the Interior and Fran Mainella, Director, National Park Service, 1849 C Street, N.W. Washington, D.C., 20240 *in official capacity* | : : : : : : | |
| and | : : | |
| W. Ralph Basham Director, U.S. Secret Service 245 Murray Drive Washington, D.C., 20223 *in official capacity* | : : : : : : | |
| Defendants. | : : | |

_____

# AMENDED COMPLAINT

### (Violations of the First Amendment and the Equal Protection Clause; Declaratory and Injunctive relief sought)

This lawsuit challenges the authority of the National Park Service to disregard the

existing constitutionally mandated public space permitting system and systematically exclude the

public and dissenters from nearly all points of space abutting the Presidential Inaugural Parade

1

route, granting exclusive access to Pennsylvania Avenue only to those who are financial and political supporters of the administration and its representative Inaugural Committee.

The National Park Service, the government entity charged with stewardship of the public's lands, has far exceeded its authority and insists that it may abridge freedom of speech and peaceable assembly along Pennsylvania Avenue, America's "Main Street," in connection with the recurring Presidential Inaugural Parades except for those whose speech is by invitation of the administration's private advocacy organization, the Presidential Inaugural Committee (hereinafter "PIC").

For the inaugural parade, the government privatizes vast portions of the sidewalks of Pennsylvania Avenue, reserving nearly all primary spaces along the route to those pre-approved by this single favored political group, in 2005, the Bush-Cheney Presidential Inaugural Committee.

The National Park Service asserts the right to delegate to this private advocacy organization (and to successor Inaugural Committees) the authority to decide who may and who may not line the Inaugural parade route at this public national ceremonial event to communicate with the administration, to petition for redress of grievances and engage in free speech and peaceable assembly. The government has conditioned access to these vast areas of Pennsylvania Avenue to those who have an association with, and who must financially support (through ticket purchase or otherwise) the private partisan Presidential Inaugural Committee.

This is a prior restraint based on political association or viewpoint that is repugnant to the Constitution and especially so when applied to prohibit the people from access to this most public of public political events.

2

Case 1:05-cv-00071-PLF Document 16 Filed 07/28/2005 Page 3 of 28

At the same time that the government seeks to deny the general public, including anti-war demonstrators, from having access to line the inaugural route on a first-come first-served basis, relegating the public to spaces behind the PIC's bleachers, in 2005 the government also banned supports for signs and placards that would facilitate the public's expression of its viewpoints in visible fashion.

The parade route, to some, perhaps looks better with limitations on visible dissent. The restrictions on disfavored groups are intended to create the appearance of uniformity and support for the policies of the administration when, in 2005, tens of thousands came from across the country to be able to demonstrate by their presence a different political message.

The signs, the manifestations of dissent, the cacophony of voices and images - - some of which support and some of which oppose certain government policies - - *is* what democracy looks like. Democracy cannot be stage managed or penned or suppressed or improperly restricted and maintain either legitimacy or vibrancy.

The government may not choose and approve the government's own viewpoint as the preferred voice in this public forum and deny all others equal access or opportunity to be heard and seen.

In January 2005, however, the government excluded the public and dissenters from over 5600 linear feet - - over a mile - - of sidewalk space abutting the relatively short parade route. This is a recurring practice and policy that occurs year after year, but which evades judicial review upon a full record due to time constraints.

Plaintiffs represent tens of thousands of political dissenters, anti-war activists and ordinary people compelled to collective action, among other reasons, by the war policies of the

Bush administration and its refusal to bring troops home now from Iraq.

The NPS provides the Inaugural Committee preferential and favored treatment, including the exclusive use of public fora and the ability to restrict access to most portions of the parade route to their hand selected invitees. Plaintiffs were burdened with restrictions and conditions not imposed on the favored PIC, including even the requirement that ANSWER provide volunteers to stay outdoors overnight in freezing cold weather without shelter or warmth and at risk to their health and safety, where the PIC and others were permitted trailers, heated rest stations and other measures needed for health, welfare and comfort.

Plaintiffs have concrete intentions to demonstrate at the next upcoming Presidential Inauguration and seek a declaration of their rights, as well as injunctive relief prohibiting the ongoing unconstitutional conduct of the NPS with respect to Inaugural Parade permitting.

Plaintiffs advance this litigation to vindicate the rights of all to equal access to the public parade portion of the Inaugural ceremony. Plaintiffs do not seek by this lawsuit to disturb the existing and exclusive systems of access to the inaugural ceremony on U.S. Capitol grounds or to Lafayette Park, where the Presidential bleachers and viewing area are located.

Plaintiffs seek the Court to issue injunctive relief prohibiting NPS from this repeated course of constitutional deprivation. They seek for the sidewalks along upcoming Inaugural Parades to be opened for equal access by all, without discrimination based on political association or viewpoint. They seek for dissenting groups and all groups to have equal rights to access the public fora, such as Freedom Plaza and other spaces suitable for group assembly in conformity with the existing permitting regulations. Plaintiffs also seek a declaratory judgment that their constitutional rights were violated by the defendants in connection with the 2005

Inaugural demonstrations.

## PARTIES

1.    Plaintiff ANSWER COALITION (Act Now to Stop War & End Racism) is an

unincorporated grassroots organization that engages in community and national political

organizing and activism including carrying out meetings, protests, mass demonstrations,

and other educational activities in opposition to war and racism. It has organized the

largest demonstrations against the war and occupation of Iraq and in support of civil

rights and civil liberties in Washington, D.C. and in other cities around the country over

the past four years since its inception on September 14, 2001. ANSWER's national

headquarters is in Washington, D.C. Plaintiff ANSWER seeks to organize and facilitate

the showing of the mass sentiment in the United States of opposition to war, exploitation,

and bigotry, though the tens of thousands of people who wish to line the Inaugural Route.

In so doing, ANSWER in the past and in connection with the 2005 Inauguration secured

demonstration permits that would enable anti-war protestors and political groups to stand

and demonstrate without fear or risk of arrest. The ANSWER Coalition has concrete

plans to organize mass demonstration activity for the 2009 Inaugural parade route and for

the foreseeable future, and seeks to line the Inaugural Parade route with protestors and

activists.

2.    Defendant GALE NORTON is the Secretary of the Interior.  One of the agencies within

the Department of the Interior is the National Parks Service ("NPS").   Defendant FRAN

MAINELLA is the Director of the NPS. The NPS is the entity responsible for

promulgation and enforcement of lawful regulations for expressive activity on federal

public fora.  The Department of the Interior is also the federal entity designated by

Congress to implement the Presidential Inauguration Committee Act.

3.      Defendant W. RALPH BASHAM is the Director of the U.S. Secret Service. The Secret

Service is the entity responsible for promulgating direction that supports for signs and

placards be banned from the Inaugural Parade route.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. §1343(a)(3) and (4) (civil rights jurisdiction).

5.      Venue is appropriately vested in this Court pursuant to 28 U.S.C. §1391 because the acts

or omissions giving rise to the claims occur or will occur in the District of Columbia

## FACTS

6.      The ANSWER COALITION has, in the past years, organized mass demonstrations in

Washington, D.C. When applying for a permit for mass demonstration activity,

ANSWER secures space that can be used for protest without fear of arrest for literally

hundreds of thousands of individual protestors and thousands of political groups from

across the nation.

7.      In connection with the 2005 Inauguration, ANSWER anticipated the participation of tens

of thousands of demonstrators who sought to engage in rallies, assemblies and to line the

Inaugural Parade route with signs of dissent.

8.      The National Park Service is the steward of the public spaces and lands under its

jurisdiction and has established a first-come first-served regulatory system for the

submission and approval of permit applications to use NPS administered public space for

6

First Amendment protected activities.

9.  It is the strict policy of the National Park Service to not accept, or to deny, any application submitted more than one year in advance of the event start date. This policy is enforced to reject permit applications of organizations, including groups engaged in political dissent, which submit applications to engage in protest more than one year in advance of the event start date. In 2001, when a political group, the International Action Center, filed ten applications for the use of public space in connection with the 2005 - 2041 Presidential Inaugurations, by response dated May 8, 2001, the NPS returned as unaccepted all such applications citing this strict policy.

10. On January 2, 2004, the ANSWER COALITION filed a permit application with the National Park Service for Inaugural related events and setup for Inauguration Day protests, including for Freedom Plaza and other spaces for the purposes of a rally and demonstration, and for the sidewalks of Pennsylvania Avenue.

11. The dates of the ANSWER COALITION's proposed activity and setup were from January 1, 2005 to January 20, 2005, a period that encompassed the Inauguration Day as well as the three weeks in advance.

12. Law enforcement has stated the intention or authority to arrest any groups of dissenters if there are 25 or more in one group - - while simultaneously allowing the assembly of busloads of tourists in far greater numbers - - and ANSWER also intended through the effect of its permit to protect its affiliated persons and other dissenters coming to Washington, D.C. from possibly being arrested should they happen to arrive or be present in groups of 25 or more.

13.     ANSWER's application specifically encompassed a permit for a mass rally and demonstration on Freedom Plaza on the day of the Inauguration including the erection of anti-war bleachers at that location, for assemblies at the Navy Memorial and on the sidewalks adjacent to the Federal Bureau of Investigation and the Department of Justice to be allowed without fear of arrest.

14.     ANSWER's permit application was not denied within 24 hours and was consequently "deemed granted" pursuant to regulation.

15.     The NPS maintains a set of boards on which it posts all permits for the upcoming year. Each board contains a calendar for one month with a listing of the permits for each day. By reference to these boards, an applicant can observe whether there are conflicting prior-in-time permit applications for any particular or desired space.

16.     As of January 20, 2004, there existed on the public boards, an application submitted by the National Park Service *to itself* on behalf of the Presidential Inaugural Committee. The board identified the specific sites for which the NPS was seeking a permit from itself. Those sites did not include Freedom Plaza or the sidewalks of Pennsylvania Avenue, among other locations encompassed by the ANSWER permit.

17.     As above, the NPS did not at that time deny the ANSWER permit request at all, including on the basis of any conflicting prior-in-time application.

18.     The ANSWER COALITION made repeated requests of the NPS to identify what, if any, part of its permit would be revoked by the government for any reason. The NPS did not advise that any revocation was to be made.

19.     In advance of any permitted demonstration, the NPS and organizers meet to discuss

8

logistics and intended space usage.

20.   The ANSWER organizers are experienced organizers and have over the past four years organized political demonstrations in Washington, D.C. in which tens and hundreds of thousands have participated. Among ANSWER organizers are individuals who have organized mass demonstrations in Washington, D.C. and elsewhere for many years.

21.   At the NPS logistical meetings, when mass demonstrations are planned such as those organized by ANSWER in the past, there is in attendance or invited representatives from the NPS, from the demonstration organizers, and from affected law enforcement such as the U.S. Park Police, the United States Secret Service and the District of Columbia Metropolitan Police Department.

22.   The ANSWER organizers requested that the NPS convene a logistics meeting for their intended activities along the Inaugural Parade route. ANSWER was advised that NPS would not provide information nor schedule the normal pre-demonstration multi-agency logistics meeting with protest organizers until after the Bush-Cheney PIC had determined what space it intended to take along the route and so advised the NPS.

23.   A meeting was finally scheduled for December 13, 2004 by the NPS. That date was explicitly chosen by the NPS because, as the NPS represented, prior to that date they would not know from the PIC what space it was planning to use.

24.   On December 13, 2004, eleven months after ANSWER's application, a logistical meeting was held regarding ANSWER's permit. At the meeting with ANSWER, representatives of the NPS, the U.S. Park Police and the U.S. Secret Service were present. The D.C. Metropolitan Police Department chose to not attend.

25.     During the proceeding eleven months the NPS never denied ANSWER's permit

        application in whole or in part.

26.     The ANSWER representatives were advised in the meeting, as well as in response to their

        prior requests for information and phone calls with the NPS, that the NPS was

        communicating and meeting with the Bush-Cheney PIC and that only based on those

        discussions would they be able to determine the status of the ANSWER COALITION's

        permit under which tens of thousands of anti-war activists and political dissenters were to

        assemble.

27.     At the December 13, 2004 meeting, the ANSWER COALITION requested to know what,

        if any, permit applications existed that could be used by the NPS to adversely affect

        ANSWER's identified and planned demonstration activities on the public space along the

        Inaugural Parade route. The NPS advised that the organizers should file a Freedom of

        Information Act (FOIA) request to secure such details which, that afternoon, the

        ANSWER COALITION filed.

28.     As above, the NPS refuses to accept permit applications submitted more than one year in

        advance. The information returned in response to the FOIA request showed that there was

        no other permit submitted *within that period* that was prior in time than the ANSWER

        application.

29.     The information did show, however, that on November 12, 2004 and December 19, 2004,

        the NPS had submitted permit applications to itself outside the one year period and in

        violation of the generally applicable permitting regulations and policies.

30.     The NPS applications were not submitted as "demonstration" applications, but were

identified as "special event" applications.

31.  Special event permits are strictly limited to three weeks in duration by regulation. 36

C.F.R. § 7.96(g)(5). Special events are not permitted to continue beyond the specified

three week period even where no other applicant has requested use of the space. 40 Fed.

Reg. 58,652 (1975).

32.  The November 12, 2003 NPS permit application was not for a limited segment of the

Pennsylvania Avenue sidewalks for the time of the Parade, but for the entire length of the

Pennsylvania Avenue sidewalks (plus additional areas) for the six-month period from

November 1, 2004 to April 1, 2005.

33.  The December 19, 2003 NPS permit application was also not limited in scope and

encompassed the period of December 19, 2004 through March 15, 2005, nearly three

months in duration.

34.  By regulation, permit applications are required to be "fully executed" in order to be

processed. 36 C.F.R. § 7.96(g)(4).

35.  The November 12, 2003 application NPS permit application was incomplete.

36.  The November 12, 2003 NPS permit application reflected no substantive response to

seven of the sixteen required categories of information. The NPS simply wrote "To Be

Determined" in response to questions regarding: Estimated maximum number of

participants; props, stage and sound equipment; whether disruption was anticipated;

marshals; communications equipment; identification of marshals; plans for loading and

unloading of busses.

37.  Were the regulations and policies that are enforced against demonstration organizers

11

applied to these two permits applications, the NPS applications would plainly be outside the standard regulations for permit issuance.

38. Because the NPS would not advise whether it intended to revoke the permits that had been granted for eleven months to ANSWER and provided ANSWER little substantive information in the initial meeting, ANSWER organizers were allowed to meet again with NPS representatives on December 20, 2004. By this time, the PIC had begun to erect bleachers on the space encompassed within ANSWER's permit, which not having been revoked remained "deemed granted" under the permitting regulations.

39. In attendance at the December 20, 2004 meeting was Mr. Randy Myers of the Department of Interior Solicitor's Office. Asked repeatedly, Mr. Myers stated that there had been no denial or revocation of the ANSWER permit. He acknowledged that the NPS had issued a permit to the Bush-Cheney PIC for exclusive use of space encompassed by ANSWER's permit. When asked directly to confirm that NPS possessed the discretion or authority to grant ANSWER's permit as requested, Mr. Myers expressly stated that he was refusing to answer that question.

40. When the media subsequently contacted the NPS to inquire about this apparently contradictory position, the NPS represented that there had been no final decisions as yet regarding use of the space requested by ANSWER and that the PIC's use of space remained tentative.

41. The NPS repeatedly represented that demonstrators and the public would be allowed access to the "open space" that was leftover after the PIC claimed what it wanted, but the NPS refused to identify what open spaces would exist for public use.

42. During the course of the December 20, 2004 meeting, the NPS continued to act as if ANSWER might still be allowed its permit or at least a substantial portion of the permit. During the meeting, the NPS asked detailed questions and received detailed answers regarding ANSWER's intended use of Freedom Plaza for a rally. NPS required, and ANSWER provided, detailed specifications including the height and width of bleacher seating, stage size, amplified sound and sound relay stations, press risers, location and provision of first aid support stations, use of generators, tables and plans for sales and solicitations.

43. By letter dated December 23, 2004, ANSWER communicated with the NPS, advising that there remained the appearance that NPS was seeking to obstruct or frustrate resort to the Courts by delaying, providing contradictory information, or "run[ning] down the clock" by refusing to revoke ANSWER's permit if that was in fact their intention.

44. On December 23, 2004, the NPS did revoke ANSWER's permit. The NPS offered ANSWER space to gather at John Marshall Park which afforded a mere 210 feet abutting Pennsylvania Avenue (as compared to the PIC's 5600+ feet of access to the parade); revoked ANSWER's permit insofar as it preserved the sidewalks of Pennsylvania Avenue for access by the public, including anti-war demonstrators, to line the parade route with expressive activity; and revoked ANSWER's permit for Freedom Plaza with the exception of five feet of space abutting Pennsylvania Avenue and other spaces located *behind* the towering PIC bleachers; allowed dissenters one site that was over 100 feet away from Pennsylvania Avenue and one other space that was literally behind a wall; and allowed dissenters to assemble in a total of four additional spaces that were also located

behind the 10' to 14' tall PIC bleachers.

45.     NPS-produced maps reflect that the PIC had over 5,600 linear feet of sidewalk space

along the parade route (as compared to the 215 linear feet allotted to the tens of thousands

of dissenters assembling under the umbrella of ANSWER's permit).

46.     Tall PIC bleachers lined over one mile of space along Pennsylvania Avenue, effectively

eliminating the usefulness of any space behind those bleachers for expressive activity

directed at parade participants.

47.     The NPS authorized and enforced exclusion zones for all space in front of PIC bleachers

and encompassing space on the sides and around PIC bleachers. These exclusion zones

encompassed virtually all useful space on the public sidewalks. This was a marked

expansion of the exclusivity of the parade route such that it was now largely accessible

only to persons vetted and invited by the Bush-Cheney PIC. In 2001, while the parade

route was dominated by the exclusive space for the PIC, protestors could maintain a

sharply limited presence by lining the parade route in the "open space" between and in

front of the bleachers. In 2005, that space was no longer considered "open space."

48.     Access to the vast Pennsylvania PIC exclusion zones is afforded on an invitation only

basis. The NPS delegates fully the authority and discretion to select who may enter upon

these vast exclusion zones along the public fora of the parade route. This occurs for every

Inauguration.

49.     On the day of the Inauguration, the NPS and law enforcement use state and government

authority to systematically exclude from these massive zones - - that go all the way up to

the curb - - all those who have not been pre-approved and screened by the Inaugural

Committee and who have supported the administration's PIC with a payment for the ticket.

50. It is constitutionally impermissible for the NPS to maintain the discretion, or delegate the discretion, to restrict free speech activities along the parade route to those who support the administration or have a political affiliation or financial transaction with the Bush-Cheney Inaugural Committee or that of *any* particular administration.

51. Plaintiffs challenge this system facially, as well as on an administered basis. Regardless of whether the PIC exercises its unconditional authority to decide who may attend the parade in the vast PIC-exclusive spaces, the system is constitutionally impermissible for multiple reasons, including that this system has no narrowly defined and objective criteria to prevent such discrimination.

52. The PICs do not make available seating along the parade route on a discrimination-free basis. In 2001, according to internal Bush-Cheney PIC documents secured in litigation, not a single ticket was distributed to the general public. The 2001 Bush-Cheney PIC created three lists of persons, "A" list persons, "B" list persons, and "C" list persons. The "C" list was the general public, not one of whom was allowed a ticket.

53. Both the 2001 and 2005 Bush-Cheney Presidential Inaugural Committees announced to the public that tickets to the parade were available from their Ticketmaster hotline. However, Ticketmaster will only sell a person a ticket if that person can present an "invitation number" issued by the PIC. Ticketmaster, the PIC, and the government refuse to make these tickets available to the public. There is no way for a member of the public to call the PIC and get an invitation number. They are reserved for those hand-selected by

15

the PIC and who are willing to pay the PIC for a ticket.

54. At the 2001 Inauguration, not only did the Bush-Cheney PIC have an exclusive bleacher policy, but the government actually enforced exclusion of the public from the bleachers even though many bleacher sections were entirely empty due to rainy and inclement weather and no-shows.

55. Whatever minimal space is allowed to the public and to dissenters, there is no opportunity for there to be a mass manifestation along the parade route - - except for the uniform support of the administration manifest by the privileged and selected PIC invitees.

56. Picket signs have long traditionally be displayed on sign supports so that the placards can, in fact, be seen.

57. At the 2005 Inaugural Parade, the Secret Service enacted a new ban on all supports for signs and placards - - a restriction even stricter than that imposed for those who assemble upon the White House sidewalks, which allows sign supports that meet certain criteria regarding size and construct.

58. This restriction has no basis in genuine security interests and encompasses items such as hollow cardboard supports that have no offensive or defensive value as potential weapons. The Secret Service, while prohibiting cardboard supports in the area of the parade, expressly allows umbrellas, which typically are constructed with long metal spines that are capable of being removed and wielded as weapons.

59. Each and every PIC space has a direct line of sight to and from the parade and its participants. While PIC hand-selected guests are given unobstructed front row access and literally are literally elevated through the use of bleachers, ordinary people including

16

particularly dissenters are forced to display their signs without supports from behind ten or twenty foot high PIC bleachers.

60.     It is plain that all points of view are not afforded an equal opportunity to win the attention of the administration members and President in the parade where such burdens and restrictions fall upon the shoulders of everyone who has not been selected in advance by the administration through its PIC.

61.     In 2005, the government conditioned the limited access afforded the ANSWER COALITION upon compliance with burdensome, and inhumane, conditions that were not similarly imposed on the PIC permit holder.

62.     On Tuesday, January 11, 2005, representatives of ANSWER engaged in a walk through of their severely restricted permitted space with the responsible NPS Park Rangers. During the walk through specific logistical needs and arrangements necessary to the use of the space were discussed and the NPS provided verbal assurances and agreements regarding what was permitted. On Friday, January 14, 2005, ANSWER filed a complaint in U.S. District Court after certain other NPS representatives simply refused to respond to communication and efforts at resolution. At 7:00 p.m. that night, just hours after the complaint was filed and served, the NPS sent correspondence revoking and rescinding the agreements that had been reached during the walk through.

63.     The NPS required an unarmed guard be present at their site from January 19 through January 21, while any equipment was present. The overnight lows were below freezing, in the 20s, and with blowing wind subject to a wind chill that was life threatening during extended periods of exposure. During the January 11, 2005 walk through, the NPS

17

Rangers suggested that ANSWER use three "warming tents" for the warmth and safety of persons standing guard duty overnight. In the January 14 letter, the NPS advised that warming tents would be prohibited because the tent sides could conceal activity therein. ANSWER responded that they would secure tents with clear sides that would not obstruct the view. When ANSWER raised this issue in the federal court hearing on the preliminary injunction in this matter, the government assured the Court that it need not address the issue because of ANSWER's proposed clear sided tents. Hours later, the government banned the clear sided tents, barring any warming tents on the purported basis that there might be a momentary light reflection off the plastic panels that could obstruct the Secret Service from monitoring the activities inside the tent.

64. The PIC was allowed closed trailers along the route. The NPS authorized the placement of no less than six heated and enclosed areas for their and the PIC's security and personnel.

65. The government thus conditioned ANSWER's use of their permitted space on having a guard or guards spend the night unprotected in potentially sub-zero weather (with consideration for the wind chill factor). ANSWER had hired a professional security company to provide two unarmed security guards to provide overnight services each night. However, when advised in advance of these new and discriminatory conditions, no professional guard was willing to provide his or her services due to the necessary exposure to the life threatening cold. These conditions were below the minimal acceptable conditions for health, comfort and safety of every security firm contacted.

66. Law enforcement threatened that if ANSWER's space was unattended for any amount of

18

time, all of their equipment and setup would be dismantled and confiscated by the government.

67.     The ANSWER organizers and dedicated youth volunteers, unwilling to lose the limited free speech and parade access that they were being allowed, organized themselves to stay outside in the freezing cold without warmth or shelter. Because the weather was so severe, and despite purchasing over six hundred dollars of extreme weather gear, the volunteers each could only stay outside in the night for a small number of hours. Through the night volunteers traded shifts to guard the space in John Marshall Park.

68.     The NPS denied ANSWER permission to place a generator near their sound system, even though ANSWER documented and provided to the NPS a list of eleven (11) generators placed along Pennsylvania Avenue in a similar position to that required by ANSWER. While the PIC could place its generators within 12 feet of the parade route, ANSWER's generator had to be placed 350 feet away because of "concerns" regarding its proximity to the parade route. This required additional expense, as well as the laying of hundreds of feet of covered cable through the length of the park.

69.     The NPS barred ANSWER from having chairs for the use of the elderly and disabled, ostensibly because of concerns about their proximity to the U.S. Capitol, while allowing the PIC to place 30,000 chairs on the Mall in even closer proximity to the Capitol.

70.     The government imposed additional arbitrary last minute conditions on the ANSWER COALITION, for example, stating just before the demonstration that they would need to surround their sound speakers with bike racks and that, if ANSWER failed to do so, their sound system would be confiscated by the government. It is impossible to secure bike racks from a Washington, D.C. supplier in the days leading to the Inauguration because the government itself has rented out miles of bike racks for its use: there are not any left.

19

However, after a diligent search, ANSWER was able to locate a distributer in Baltimore and take volunteers off of other duties to locate a van and travel to pick up the bike racks.

71. Law enforcement then seized the bicycle racks, which were surrounding the sound system as ordered. They took them away and dumped them elsewhere where, fortunately, they were located by volunteers.

72. The government set up and administered check points in such a manner as to restrict access to the John Marshal Park, site of the sole location granted for mass assembly by protestors. Many thousands of protestors were thus barred from ever accessing the parade route.

73. Other burdensome restrictions, conditions and demands were imposed arbitrarily upon ANSWER in what appeared to be a calculated effort to create pretext for law enforcement to come in and dismantle and confiscate ANSWER's setup, as threatened. Only through the dedication of ANSWER volunteers through extraordinarily unreasonable and harsh conditions was ANSWER able to protect its equipment and space from law enforcement confiscation or forfeit and to have its public protest.

**STANDING**

74. The unconstitutional policies challenged herein remain unabated and, as such, are challenged as ongoing unconstitutional prior restraint on free speech and assembly.

75. The unconstitutional conduct manifests itself at every Presidential Inauguration, which recur quadrennially as well as under exceptional circumstances.

76. The desire of persons to engage in political protest, assembly, association and expression at the Presidential Inauguration will foreseeably recur so long as there are public Inaugurations.

77. ANSWER's interests lie both in securing space for use as a rally and assembly site(s) and

to ensure that ANSWER and those affiliated with ANSWER or who support its political message have the ability to line the parade route with a mass demonstration of collective action.

78.  It is the declared policy and position of the National Park Service that for purposes of the Presidential Inauguration, it need not abide by the ordinarily applicable permitting regulations and that it may favor one private political advocacy group, the incoming administration's Inaugural Committee, such that the public and dissenters are excluded from vast portions of the public sidewalks and public fora and are denied access to the public Inaugural Parade on the same terms and conditions which benefit the PIC.

79.  The NPS's overextension of its authority and desire to avoid a visible display of political discontent with the administration recurs regardless of which of the two dominant political parties is victorious in the Presidential election.

80.  The NPS's unconstitutional conduct has created the need for constitutional rights litigation by political dissenters in each of the past three immediately preceding Presidential elections, with each case proceeding without benefit of a full record due to sharp time constraints.

81.  For the 1997 Inauguration of William J. Clinton, the NPS advised that protestors who opposed the incoming administration's policies and who picketed in "space[s] assigned to the Presidential Inaugural Committee" would be subject to arrest. See, Mahoney v. Babbitt, 105 F.3d 1452, 1454 (D.C. Cir. 1997). That suit proceeded without benefit of a full record on an emergency basis with severe time restraints. Id., at 1455.

82.  In Mahoney, due to the emergency basis on which the hearing was held, and due to an incomplete record, the Court was unable to address the underlying merits of that plaintiff's claims that the NPS had unconstitutionally violated its own regulations when it

granted a massive permit to itself which failed to conform to the permitting regulations, in order to later transfer that permit to the Clinton-Gore Presidential Inaugural Committee, according it preferential treatment. Id.

83. For the 2001 Inauguration of George W. Bush, the NPS revoked the permit for Freedom Plaza and other spaces, deemed granted to political protestors, in order to transfer use of those spaces to the Presidential Inaugural Committee. Protestors alleged that the NPS refusal to abide by their own regulatory system in order to grant exclusive use of space to the favored PIC was unconstitutional. The motion for a preliminary injunction was heard on an emergency basis and was not based on a full record. International Action Center, et al. v. United States, et al., Civil Action No. 01-0072 (GK).

84. For the 2005 Inauguration of George W. Bush, again the NPS at the last minute revoked protestors' demonstration and assembly permits in order to give exclusive use of that space to the PIC. The motion for a preliminary injunction was heard on an emergency basis and was not based on a full record.

85. Plaintiffs are advocates of social justice issues that transcend which of the two dominant political parties wins the Presidential election, and consequently have concrete intentions to demonstrate at the next Presidential Inauguration even at this time. They seek an adjudication of the unconstitutional policies and practices of the NPS and Secret Service that currently and concretely threaten to abridge their intended free speech, petition and assembly activities.

86. Litigation filed only upon the formal denial of a demonstration permit affords no opportunity for meaningful judicial review, including full appellate consideration, upon a full record due to the limited time constraints inherent in this particular nature of controversy.

## COUNT I
### (Unconstitutional Permitting Violations)
### First Amendment Freedom of Speech and Assembly; Right to Petition Government for Redress of Grievances; Equal Protection Clause

87. Paragraphs 1 through 86 are incorporated by reference herein.

88. The conduct complained of herein deprives plaintiffs and other members of the public of their constitutional rights pursuant to the First Amendment to assemble in public places and communicate their views to other members of the public, to present grievances to government officials, and to equal protection under the law.

89. The NPS is constitutionally obligated to apply to itself and the PIC, in issuing permits, the same narrowly-drawn and generally applicable regulations to which others must conform. It is constitutionally impermissible for the NPS to exempt itself or the PIC from the constitutionally mandated permitting system, particularly where such deviation works an abridgment of others' free speech, petition and assembly rights.

90. The NPS action, in excluding the public and anti-war demonstrators from vast sections of the Inaugural Parade route is not a reasonable time, place or manner regulation.

91. The NPS actions and policies constitute viewpoint-based and content-based discrimination, favoring those approved by the administration's Inaugural Committee and disfavoring those who are not so approved, especially those who wish to express their opposition to the current administration's policies at this unique quadrennial political moment through mass assembly and visible protest.

92. The exclusion of the public and dissenters from vast sections of the public Inaugural Parade route in order to favor those selected by the PIC does not further any compelling state interest. Nor does it further any significant state interest. The government's *legitimate* interest in the public Inaugural Parade is to provide access to all on the same

terms and conditions, regardless of political associations or financial contributions to the prevailing administration or its inaugural committee.

93.  The NPS actions and policies do not serve *any* significant government interest, let alone a compelling interest, by the broad exclusion of expressive activity along the parade route.

94.  The government conduct is not narrowly tailored nor appropriately limited in discretion as it is expansive, flies in the face of the NPS' own regulations and is made without any standards or guidelines to guide and restrain discretion to allot public space on the sidewalks along the Inaugural Parade.

95.  The NPS actions and policies also fail to leave open ample alternatives for communication by those who are excluded from the vast area reserved for the Inaugural Committee's supporters.

96.  There is no constitutional basis to distinguish between those who have been pre-approved by a private political body to have expansive access to the parade route, while banning all others who lack such favored and privileged status from even assembling on most of Pennsylvania Avenue.

97.  Plaintiffs suffer irreparable harm by the denial and abridgment of their free speech rights, as individuals and as groups, to line the parade route and engage in free speech, petition, assembly and associational activities.

## COUNT II
### (Prohibition on Sign Supports)
### First Amendment Freedom of Speech and Assembly; Right to Petition Government for Redress of Grievances; Equal Protection Clause

98.  Paragraphs 1 through 86 are incorporated by reference herein.

99.  The conduct complained of herein deprives plaintiffs and other members of the public of their constitutional rights pursuant to the First Amendment to assemble in public places

and communicate their views to the administration, to other members of the public, to present grievances to government officials, and to equal protection under the law.

100.    There is no legitimate basis for the prohibition on all sign supports, including those supports that are made of hollow cardboard and can be inspected at the checkpoints, particularly where these restrictions are not even required for demonstrations on the White House sidewalks - - which are the locations that have had the strictest restrictions on demonstration activity due to their proximity to the White House.

101.    The ban on sign supports disproportionately burdens those who are not privileged to have been pre-approved by the PIC for bleacher seating and, in fact, is a mere cover for viewpoint based discrimination that favors pre-approved administration supporters and burdens all others. The PIC-approved attendees do not need sign supports because they are physically elevated by an enormous bleacher supports made of wood, metal and piping (elements which have a greater offensive risk than hollow cardboard sign supports).

102.    Plaintiffs suffer irreparable harm by the denial and abridgment of their free speech rights, as individuals and as groups, to line the parade route with signs elevated on pickets and engage in free speech and petition activities.

### Count III
### Injunctive Relief for Violation of First Amendment and Equal Protection Clause

103.    Paragraphs 1 through 86 are incorporated by reference herein.

104.    There is no substitute day for the intended expressive activity.  The plaintiffs are not seeking to secure access to the swearing-in ceremony on U.S. Capitol grounds. They are not seeking access to the spaces set aside by regulation for the exclusive use of the Inaugural Committee, on the sidewalks of the White House and in three-quarters of

Case 1:05-cv-00071-PLF Document 16 Filed 07/28/2005 Page 26 of 28

Lafayette Park. They are not seeking access to the many private balls and fundraisers at which the President will appear. All the people have is the sidewalks and public parkland. That is what plaintiffs seek, to allow *all* members of the public to line the Inaugural Parade route on a first-come first-served basis without suffering political discrimination.

105.   The intended expressive activity of the demonstrators is to *collectively line the parade route* with their signs, their bodies and to amplify their presence with their collective voices.  The exclusion of the public from vast portions of Pennsylvania Avenue that has been reserved for the favored Inaugural Committee prevents that mass expression.

106.   There is no adequate substitute for allowing the public, including demonstrators, to line the parade route on a first-come first-served basis. The granting to ANSWER of permission in 2005 to use John Marshall park, with its 210 linear feet of access to the parade route, is not close to an adequate substitute for equal access to line the parade route by the demonstrating public. It simply does not remedy the problem, to provide demonstrators with a sliver of their rights or a sliver of access to the route.

107.   In the instant case, plaintiffs have already suffered irreparable harm in their ability to organize and plan for their 2005 Inaugural demonstration. The uncertainty created by the NPS practice of revoking permits at the very last moment, notwithstanding long-standing knowledge and intention to do so, is terribly disruptive.

108.   Without an injunction issued by this Court ordering equal access for the public and dissenters to the parade route, Plaintiffs and the public interest will suffer even greater irreparable harm.

WHEREFORE, Plaintiffs request the following relief (none of which shall disturb the Inaugural Committee's current allowance by regulation to exclusive access and use of the White House sidewalks and three-fourths of Lafayette Park on Inauguration Day):

a. Declaratory judgment that the NPS policy and practice of exempting itself and/or the PIC from strict compliance with the generally applicable permitting regulations is unconstitutional; and an injunction prohibiting any such deviation in the future;

b. Declaratory judgment that the NPS policy and practice of granting to the PIC exclusive use of the public space abutting the Inaugural Parade route is unconstitutional; an injunction prohibiting such discriminatory conduct in the future; and a mandatory injunction that the NPS make the sidewalks abutting the Inaugural Parade generally open to the public for use, with accommodations for reasonable logistical needs and to afford access by the disabled where such reasonable accommodations neither favor nor burden any group on the basis of political association or viewpoint, and to also allow the continued traditional use of the sidewalk in front of the Wilson Building for a reviewing stand for District of Columbia officials and invitees consistent in size with that used in 2005;

c. Declaratory judgment that the prohibition on supports for signs and placards is unconstitutional, and a mandatory injunction that the NPS and/or Secret Service promulgate constitutionally permissible regulations regarding use of such supports if they have a constitutional basis for regulating such items;

d. Declaratory judgment that plaintiffs suffered a violation of their constitutional rights in connection with the 2005 Inauguration restrictions;

e. An award of plaintiff's reasonable attorneys' fees, costs and expenses; and

f. Such other and further relief, including all appropriate equitable relief, as to the Court may seem proper.

Respectfully Submitted,

July 28, 2005

_____

Carl Messineo (#450033)
Mara Verheyden-Hilliard (#450031)
Merrilyn Onisko[1]

PARTNERSHIP FOR CIVIL JUSTICE, INC.
1901 Pennsylvania Ave., NW, Suite 607
Washington, D.C. 20006
(202) 530-5630

_____

Carol A. Sobel
*appearing pro hac vice*
LAW OFFICES OF CAROL A. SOBEL
429 Santa Monica Blvd, Ste. 550
Santa Monica, California 90401
(310) 393-3055

All attorneys also on behalf of the
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE

---

[1] Admitted to the U.S. District Court for the District of Columbia, to the U.S. District Court for the Eastern District of Michigan, and in the State of Michigan; Application pending for District of Columbia.