UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
A.N.S.W.E.R. COALITION,                 )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          Civil Action No. 05-0071 (PLF)
                                        )
DIRK KEMPTHORNE,                        )
          Secretary of the Interior, et al., )
                                        )
          Defendants.                   )
_____ )

OPINION

          Plaintiff A.N.S.W.E.R. (Act Now to Stop War and End Racism) Coalition

("ANSWER") filed this lawsuit against defendants Dirk Kempthorne, Secretary of the Interior,

Mary Bomar, Director of the National Park Service ("NPS"),[1] and Mark Sullivan, Director of the

United States Secret Service, seeking declaratory and injunctive relief on three claims, all

alleging violations of the First Amendment and the Equal Protection Clause of the United States

Constitution arising from policies and practices engaged in with respect to the Presidential

Inaugural Parade in January 2005.[2]  This matter is before the Court on defendants' motion for

summary judgment and plaintiff's cross motion for partial summary judgment.[3]  The Court

_____

          [1]     National Park Service Director Mary Bomar has been substituted for former
Director Fran P. Mainella by operation of Rule 25(d) of the Federal Rules of Civil Procedure.

          [2]     Additional plaintiffs were named in the original complaint.  When the operative
amended complaint was filed on July 28, 2005, ANSWER was the only named plaintiff.

          [3]     The papers submitted in connection with these motions include: Defendants'
Motion to Dismiss or, in the alternative, for Summary Judgment ("Defs' Mot."); Memorandum
in Support of Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment

previously addressed the justiciability of the claims in this case in an Opinion and Order dated

June 13, 2007.  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d 34 (D.D.C. 2007).

The Court described the background of this case in that Opinion, so it will repeat only relevant

portions here.

## I.  BACKGROUND

The 2005 Inauguration of President George W. Bush took place on January 20,

2005 here in Washington, D.C.  The inaugural parade route included, as it always does,

Pennsylvania Avenue between the United States Capitol and the White House.  Since 1996,

much of the Pennsylvania Avenue corridor, including Pershing Park, Freedom Plaza, the Navy

Memorial and John Marshall Park, has been part of the Pennsylvania Avenue National Historic

Park.  See Declaration of Robbin Owen ("Owen Decl.") ¶ 14.  It therefore is under the

jurisdiction of the National Park Service, which generally is authorized to promulgate rules and

regulations "for the use and management of parks[.]"  16 U.S.C. § 3.  NPS issues regulations

specifically with respect to the parklands in the National Capital Region and permits relating to

activities within them.  See generally 36 C.F.R. § 7.96(g).  The Presidential Inaugural

Ceremonies Act ("PICA"), 36 U.S.C. § 501 et seq., which was enacted in 1956, also governs

---

("Defs' Mem."); Defendants' Statement of Material Facts as to Which There is No Genuine Issue
("DSMF"); Plaintiff's Opposition to Defendants' Motion to Dismiss or, in the alternative, for
Summary Judgment and Cross Motion for Judgment on the Pleadings or, in the alternative, for
Summary Judgment ("Pl's Mot."); Plaintiff's Statement of Material Facts as to Which There
Exists a Genuine Issue ("PSMFD"); Defendants' Opposition to Plaintiff's Cross Motion for
Summary Judgment and Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss or, in
the alternative, for Summary Judgment ("Defs' Opp."); and Reply in Support of Plaintiff's Cross
Motion for Summary Judgment ("Pl's Reply").

inaugural events.[4]

Plaintiff purports to represent "tens of thousands of political dissenters, anti-war activists and ordinary people compelled to collective action, among other reasons, by the war policies of the Bush administration and its refusal to bring troops home now from Iraq." Am. Compl. at 3-4. Plaintiff asserts that it has "concrete intentions to demonstrate at the upcoming Presidential Inauguration" on January 20, 2009 regardless of which party's candidate is elected, and that it advances this litigation to "vindicate the rights of all to equal access to the public parade portion of the Inaugural ceremony." Id. at 4.

Plaintiff alleges that it is the strict policy of the NPS not to accept any permit applications submitted more than one year in advance of the start date for any event on Park Services land. See Am. Compl. ¶ 9; PSMFD ¶ 4. Defendants agree that this is their policy. See Owen Decl. ¶ 12. Plaintiff argues that this policy is used to reject permit applications of organizations, "including groups engaged in political dissent." Am. Compl. ¶ 9.[5] Plaintiff also asserts that the policy is waived or disregarded for the Presidential Inaugural Committee ("PIC"), which is given priority over everyone else by being allowed to submit its permit application earlier than any other group, and that it then is given exclusive use of most of the parade route.

---

[4]    As relevant, the applicable statutes and regulations are described more fully below.

[5]    Plaintiff's evidence in support of the NPS policy of not accepting applications submitted more than one year in advance of an event start date consists of an affidavit of ANSWER National Staff Director Sarah Sloan. See Affidavit of Sarah Sloan, Exh. 1 to Pl's Mot., ("Sloan Aff.") ¶ 5. Plaintiff also includes a December 15, 2004 letter to plaintiff's counsel, including a footnote referencing an NPS response dated May 8, 2001 returning as unaccepted "ten unfiled applications that prematurely sought the use of Freedom Plaza and Lafayette Park for the 2005-2041 Presidential Inaugurations." December 15, 2004 Letter from NPS to Messineo, Exh. 61 to Pl's Mot. and Exh. J to the Owen Decl. ("December 15, 2004 NPS Letter").

See Am. Compl. at 4 and ¶¶ 16, 29, 32, 33.

On November 12, 2003 and December 19, 2003, NPS submitted special event

permit applications to itself, on behalf of the yet-to-be-formed PIC, in connection with the 2005

Inauguration.  See Owen Decl., Exh. B ("November 12, 2003 NPS Application"); see also DSMF

¶ 1.[6]  The application was "for the parade route from the National Capital Area, 3rd Street to 17th

Street including sidewalks on both sides of the street, Lafayette Park, White House sidewalk[.]"

DSMF ¶ 5 (citing and quoting the November 12, 2003 NPS Application).  Plaintiff argues that

the application submission was "outside the one year period and in violation of the generally

applicable permitting regulations and policies."  Am. Compl. ¶ 29.[7]

Plaintiff notes that the NPS has a policy, codified in the regulations, that permits

for special events and demonstrations have a maximum duration of three weeks.  See PSMFD

¶ 5; see also 36 C.F.R. § 7.96(g)(5)(iv).  The November 12, 2003 NPS/PIC application was "for

the entire length of the Pennsylvania Avenue sidewalks (plus additional areas) *for the six-month*

*period from November 1, 2004 to April 1, 2005*."  Am Compl. ¶ 32 (emphasis added); see also

DSMF ¶ 2.[8]  Defendants have submitted a declaration stating that "based on past experience, the

Park Service knew that set-up takes a substantial amount of time greater than three weeks for

_____

[6]     Defendants note that NPS has traditionally submitted applications on behalf of the
Presidential Inaugural Committee because, for obvious reasons, one cannot be formed until after
a presidential election has been decided.  See DSMF ¶ 4.

[7]     The amended complaint states that the dates were November 12, 2004 and
December 19, 2004, but the Court concludes that plaintiff intended to say "2003."  See Am.
Compl. ¶¶ 35-36 (referring to the November 12, 2003 permit application); see also DSMF ¶ 1.

[8]     The Court notes that the period between November 1 and April 1 is five months,
rather than six.

special events.  Indeed, it expected that a reasonable anticipated set-up times [*sic*] would be from November 1, 2004-January 19, 2005 and that a reasonable anticipated dismantling times [*sic*] would be from January 21, 2005 to April 1, 2005."  Owen Decl. ¶ 33.

On January 2, 2004, ANSWER filed a permit application with the NPS for 2005 Inauguration demonstration events and setup, covering a time period from January 1, 2005 to January 20, 2005.  <u>See</u> Am. Compl.  ¶¶ 10-11; <u>see also</u> DSMF ¶ 12; PSMFD ¶ 2.  ANSWER's application "was not denied within 24 hours and was consequently 'deemed granted' pursuant to regulation."  Am. Compl. ¶ 14.[9]

By January 20, 2004, plaintiff alleges, the applications submitted by NPS to itself on behalf of the PIC were visible on the public boards maintained by NPS and on which applicants "can observe whether there are conflicting prior-in-time permit applications for any particular or desired space."  Am. Compl. ¶¶ 15-16.  Within a month of submitting its permit application, plaintiff therefore was aware of the conflicting NPS/PIC special event application encompassing some or all of the same areas as its own demonstration permit application.

ANSWER alleges that it made repeated requests of the NPS to identify what, if any, part of its permit would be revoked, but received no response.  <u>See</u> Am Compl. ¶ 18; <u>see also</u> Owen Decl. ¶ 47.  ANSWER requested "that the NPS convene a logistics meeting for their intended activities along the Inaugural Parade route" and "was advised that NPS would not provide information nor schedule the normal pre-determination multi-agency logistics meeting with protest organizers until after the Bush-Cheney PIC had determined what space it intended to

---

[9]     36 C.F.R. § 7.96(g)(3) provides that "[a]ll demonstration applications . . . are deemed granted, subject to all limitations and restrictions applicable to said park area, unless denied within 24 hours of receipt."

take along the route . . ." Am Compl. ¶¶ 22, 26.  A meeting was held on December 13, 2004

with plaintiff, representatives of the NPS, the United States Park Police and the Secret Service,

but no representatives of the Bush-Cheney PIC were present.  See id. ¶ 24.  At that meeting,

ANSWER was advised by NPS representatives that the NPS was meeting separately with and

talking to the Bush-Cheney PIC and that "only based on those discussions would they be able to

determine the status of the ANSWER Coalition's permit . . . ."  Id. ¶ 26.  There was a second

logistics meeting held on December 20, 2004.  See id. ¶¶ 38-39.  Meanwhile, on December 15,

2004, NPS issued a permit to the Bush-Cheney PIC "for the parkland along the Inaugural parade

route, including Pennsylvania Avenue National Historic Park."  DSMF ¶ 8.[10]

       On December 15, 2004, NPS also sent a letter to plaintiff's counsel in response to

a FOIA request for information regarding "all applications seeking the use of Federal parkland

along Pennsylvania Avenue for the Presidential Inauguration on January 20, 2005."  December

15, 2004 NPS Letter.  The NPS letter was accompanied by five "responsive applications, in order

of receipt: applications 04-0466 and 04-0634 by the NPS on behalf of the Presidential Inaugural

Committee pursuant to the Presidential Inaugural Ceremonies Act, application 05-011 by

A.N.S.W.E.R. Coalition, application 05-0004 by D.C. Chapter of Free Republic, and application

05-0005 by the Christian Defense Coalition."  Id.  At that point at the latest, then, plaintiff must

have been aware that NPS deemed there to be an earlier permit application than the one that

plaintiff had submitted.  But plaintiff alleges that the response to their FOIA request "showed

---

[10]     While defendants' Statement of Material facts state that the date was December
15, 2005, a review of the exhibits shows that the permit date is December 15, 2004.  See Exh. D
to the Owen Decl.  There were several subsequent amendments to the permit, included as
exhibits to defendants' motion for summary judgment.

that ANSWER had first in time applications for public space in conformity with NPS

regulations.  It also showed that NPS had submitted permit applications to itself outside the one

year period of the 2005 Inauguration on behalf of the PIC."  PSMFD ¶ 18.  Plaintiff argues that

NPS "violated its own regulations for the benefit of PIC," and was giving PIC a higher priority

than ANSWER under their "first come, first serve" policy.  Id.

   Plaintiff asserts that on December 23, 2004, NPS "revoke[d] ANSWER's permit"

and offered ANSWER much more limited space for its use than it had requested in its January 2,

2004 permit application.  See Am. Compl. ¶¶ 44-46; see also Owen Decl. ¶¶ 55-59; Exh. L to the

Owen Decl. ("December 23, 2004 NPS Letter").  Defendants characterize this determination as

the Park Service "grant[ing] in part the plaintiff's permit application."  DSMF ¶ 13.  Despite

defendants' characterization of the action as "granting in part" the permit application, as noted

above, applicable regulations provide that "[a]ll demonstration applications . . . are deemed

granted, subject to all limitations and restrictions applicable to said park area, unless denied

within 24 hours of receipt." 36 C.F.R. § 7.96(g)(3).[11]  Accordingly, plaintiff's permit application

had already been "deemed granted," and defendants therefore were, in fact, revoking it in part.

   The December 23, 2004 letter revoking plaintiff's permit in part described those

areas that would be available for ANSWER's use, and explained the defendants' view that the

NPS/PIC permit application was first in time under the applicable regulations.  The defendants'

letter also assured plaintiff that "consistent with the First Amendment, the Presidential Inaugural

---

   [11] This regulation was foreshadowed by one of the holdings of the D.C. Circuit in its
Quaker Action Group series of cases, A Quaker Action Group v. Morton, 516 F.2d 717, 735-37
(D.C. Cir. 1975) ("Quaker Action IV") ("We have ruled that a permit must be deemed granted
unless denied within a stated time (24 hours unless the district court specifies another time
period).") (parentheses in original).

Ceremonies Act and National Park Services regulations, the public and demonstrators – regardless of their message – will be fully allowed onto all of the many open areas on the Pennsylvania Avenue sidewalk on January 20, 2005." December 23, 2004 NPS Letter at 4; see also DSMF ¶ 10. Plaintiff responds that "NPS reiterated many times that all areas not permitted to PIC or another group or designated for the handicapped would be public. However, NPS refused to identify where these areas were. Almost all areas of public space were obstructed by PIC structures and *NPS would not allow the general public to enter the space in front of PIC bleachers*." PSMFD ¶ 26 (citing Sloan Affidavit at 5-6; Exhibit 57; Exhibit 58; Exhibit 59) (emphasis added). Plaintiff argues that "NPS had, in effect, closed off most of the public parade route for exclusive use by private Bush supporters." Id.

NPS sent a letter to plaintiff on January 14, 2005 explaining, among other things, that plaintiff was "earlier provided a copy of the Presidential Inaugural Committee's (PIC) Permit 04-0466 Amendment 1, which fully detailed PIC's permit areas and that it included not just the bleachers themselves but also the area in front of them." See Exh. R to the Owen Decl. ("January 14, 2005 NPS Letter") at 3 (pages not numbered). NPS stated that the reserved sidewalk area in front of the bleachers – that is, between the bleachers and the parade itself – "allows bleacher access, where ticketed handicapped guests may sit, and allows all ticket holders to be able to freely observe the parade." Id.

The January 14, 2005 NPS letter makes clear that the defendants did intend to exclude non-ticket-holders from the sidewalks in front of the bleachers within the PIC permit

areas along Pennsylvania Avenue.[12]  Only those who have an invitation issued by the PIC could

get tickets to the event and therefore enter the PIC bleachers *or* occupy the Pennsylvania Avenue

sidewalk space in front of them along the parade route.  See Exh. 46 to Pl's Mot., Affidavit of

Anne Wilson ¶¶ 5-6.

> Defendants state that for the 2005 Inaugural Parade, there was:
>
> a total of approximately 8,414 lineal feet of sidewalks curb-to-curb
> from 4th Street to 15th Street.  Of these sidewalks, the Presidential
> Inaugural Committee has approximately 3,882 feet for its
> bleachers, approximately 95 feet for announcer and media stands,
> and approximately 104 feet for the Armed Forces Inaugural
> Committee trailers.  For the remaining 4,333 feet, there was
> approximately 3,878 feet available for the general public, of which
> approximately 1,252 feet was designated by the Park Service for
> the handicapped general public.

Owen Decl. ¶ 86.

Plaintiff asserts that "ANSWER was given the following spaces: John Marshall

Park which afforded 210 feet abutting Pennsylvania Avenue, five tiny areas behind bleachers

constructed by PIC, one area in Pershing Park behind a wall, and five feet of space abutting

Pennsylvania Avenue in Freedom Plaza.  In effect, the opposition assembly was placed in tiny

pockets away from the front of the parade route and frequently behind massive bleachers of Bush

supporters."  PSMFD ¶ 22 (citing Sloan Affidavit, Exh. 1 at 4; Exh. 34; Exh. 35).  Plaintiff also

observes that the "area in Freedom Plaza was the only area other than John Marshall Park that

was not behind bleachers and abutted the route.  However, at five feet of linear space along

---

[12]     Defendants included a map of the federal parkland along Pennsylvania Avenue,
detailing the location of permit areas and the PIC's bleachers as Exhibit W to the Owen
Declaration, but the map does not appear in the Court's electronic case filing system.  See Owen
Decl. ¶ 82.

Pennsylvania Avenue, it was too small for a large scale protest." PSMFD ¶ 23 (citing Sloan Affidavit at 5). By contrast, the plaintiff claims that the "breadth of Pennsylvania Avenue that abuts the parade route set aside exclusively for PIC was over 4,272 feet of the route. This was 22 times the access given to the public and protestors." PSMFD ¶ 25 (citing Sloan Affidavit at 5; Exhibit 48).[13]

Defendants respond that "[t]he nine park areas for plaintiff's permits were sufficient to fully accommodate the requested numbers of participants for their demonstration activities and in many areas allowed the plaintiff's group to see and be seen from the parade route." DSMF ¶ 13; see also Owen Decl. ¶¶ 69-76 (describing in detail areas allowed to plaintiff under its permit).

Plaintiff filed this lawsuit on January 14, 2005, seeking an expedited preliminary injunction against the National Park Service and the United States Secret Service "to preclude denial of access to the 2005 Inaugural Parade Route." Complaint at 1. A hearing on the motion for preliminary injunction was held before the undersigned on January 18, 2005. At the conclusion of the hearing, the Court denied the motion for a preliminary injunction, explaining its reasoning in an oral opinion. See January 18, 2005 Order; Transcript of Excerpt of January 18, 2005 Preliminary Injunction Hearing ("PI Transcript"). Plaintiff did not appeal the Court's denial of the motion for a preliminary injunction.

ANSWER filed an amended complaint for declaratory and injunctive relief on July 28, 2005. The parties subsequently briefed the dispositive motions that are now before the

---

[13]      The Court assumes, based on mathematics, that by the phrase "the public and protesters" plaintiff means the access given for its – ANSWER's – exclusive use.

Court.  Plaintiff states that it "advance[s] this litigation to vindicate the rights of all to equal access to the public parade portion of the Inaugural ceremony," and makes clear that it does not "seek to disturb the existing and exclusive system of access to the inaugural ceremony on the U.S. Capitol grounds or to Lafayette Park[.]"  Am. Compl. at 4.  Rather, plaintiff  seeks "injunctive relief prohibiting NPS from this repeated course of constitutional deprivation[.]"  Id.

Count I of the amended complaint alleges "unconstitutional permitting violations" under the First Amendment and the Equal Protection Clause.  See Am. Compl. ¶¶ 87-97.  More specifically, plaintiff asserts that "it is constitutionally impermissible for NPS to exempt itself or the PIC from the constitutionally mandated permitting system, particularly where such deviation works an abridgement of others' free speech, petition and assembly rights."  Id. ¶ 89.  Plaintiff also asserts that the "NPS action, in excluding the public and anti-war demonstrators from vast sections of the Inaugural Parade route is not a reasonable time, place or manner regulation[,]" and that the "NPS actions and policies constitute viewpoint-based and content-based discrimination, favoring those approved by the administration's Inaugural Committee and disfavoring those who are not so approved, especially those who wish to express their opposition to the current administration's policies at this unique quadrennial political moment through mass assembly and visible protest."  Id. ¶¶ 90-91.

Count II alleges that the prohibition on sign supports also violates the First Amendment and the Equal Protection Clause.  See Am. Compl. ¶¶ 98-102.  On November 13, 2007, the Court granted plaintiff's motion for discovery under Rule 56(f) of the Federal Rules of Civil Procedure, solely with respect to the claims relating to the prohibition of sign supports, and denied without prejudice defendants' motion for summary judgment with respect to those claims.

11

See November 13, 2007 Order.  This Opinion will not address Count II of the amended complaint because there is no motion before it with respect to that claim.

Finally, Count III requests injunctive relief for the violation of plaintiff's First Amendment and equal protection rights, seeking "equal access for the public and dissenters to the parade route." Am. Compl. ¶ 108.  In Count III, plaintiff requests that no one, including itself and the PIC, be given exclusive access to the parade route on Inauguration Day, but rather that everyone – demonstrators and administration supports and tourists alike – be able to mingle freely on the sidewalks of Pennsylvania Avenue.[14]

Plaintiff requests the following relief, in relevant part, in its amended complaint:

a.  Declaratory judgment that the NPS policy and practice of exempting itself and/or the PIC from strict compliance with the generally applicable permitting regulations is unconstitutional; and an injunction prohibiting any such deviation in the future;[15]

_____

[14]  As the amended complaint makes clear:

[P]laintiffs are not seeking to secure access to the swearing-in ceremony on U.S. Capitol grounds. They are not seeking access to the spaces set aside by regulation for the exclusive use of the Inaugural Committee, on the sidewalks of the White House and in three-quarters of Lafayette Park. They are not seeking access to the many private balls and fundraisers at which the President will appear. All the people have is the sidewalks and public parkland. That is what plaintiffs seek, to allow *all* members of the public to line the Inaugural Parade route on a first-come first-served basis without suffering political discrimination.

Am. Compl. ¶ 104.

[15]  In its Opinion addressing the justiciability of the claims in this case, the Court concluded that plaintiff has standing to litigate claims relating to the denial of permit applications that it has submitted or will submit.  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d at 45-46.  The Court also concluded that this claim is capable of repetition, yet evades review. See id. at 46.  The first request for relief, related to Count I, therefore is ripe for adjudication.

b.  Declaratory judgment that the NPS policy and practice of granting to the PIC exclusive use of the public space abutting the Inaugural Parade route is unconstitutional; an injunction prohibiting such discriminatory conduct in the future;  [and a mandatory injunction that the NPS make the sidewalks abutting the Inaugural Parade generally open to the public for use, with accommodations for reasonable logistical needs and to afford access by the disabled where such reasonable accommodations neither favor nor burden any group on the basis of political association or viewpoint, and to also allow the continued traditional use of the sidewalk in front of the Wilson Building for a reviewing stand for District of Columbia officials and invitees consistent in size with that used in 2005;][16]

c. [Declaratory judgment that the prohibition on supports for signs and placards is unconstitutional, and a mandatory injunction that the NPS and/or Secret Service promulgate constitutionally permissible regulations regarding use of such supports if they have a constitutional basis for regulating such items;][17]

d. [Declaratory judgment that plaintiffs suffered a violation of their constitutional rights in connection with the 2005 Inauguration restrictions;][18]

---

[16]    With respect to the second request for relief, specifically the requests for a declaratory judgment "that the NPS policy and practice of granting to the PIC exclusive use of the public space abutting the Inaugural Parade route is unconstitutional; [and] an injunction prohibiting such discriminatory conduct in the future," the Court concluded that the ANSWER Coalition has both organizational and representational standing to litigate for such non-exclusive access to those sidewalks.  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d at 47. This claim also is capable of repetition yet evades review.  See id.  Thus, the first portion of the second request for relief, related to Count III, is currently before the Court.

The Court concluded, however, that plaintiff has no standing to make requests generally on behalf of "the public," the "disabled," or "District of Columbia officials and invitees."  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d at 47.  The portion of the request for relief that is in brackets therefore is not before the Court.

[17]    As explained above, plaintiff's request for relief with respect to the ban on sign supports (Count II) is not before the Court at this time.

[18]    With respect to plaintiff's fourth request for relief, the Court concluded that because it is unable now to grant any meaningful relief to the parties with respect to the events

Am. Compl. at 27.

Defendants seek summary judgment on the merits because, they argue, plaintiff was afforded adequate space, any restrictions were reasonable time, place or manner limitations, and NPS did not violate its regulations or policies, or the PICA . See Defs' Mem. at 3.  Plaintiff moves for summary judgment only on Count I, "on the claim that it is a constitutional violation for the NPS to deviate from the regular permitting system and established policies in order to grant preferential treatment to a favored group, the Presidential Inaugural Committee, in the permitting of spectator space along the Inaugural Parade Route."  Pl's Mot. at 54.

## II.  LEGAL FRAMEWORK

### A.  Summary Judgment Standard

Summary judgment may be granted only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits [or declarations], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248)  An issue is "genuine" if the evidence is such that a reasonable factfinder could

---

surrounding the 2005 Inauguration, this is a request for an improper advisory opinion; that is to say, this claim is moot. See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d at 48.  That question therefore is not before the Court.

return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248;

Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under

consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v.

Potomac Elec. Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006), cert. denied, 127 S. Ct. 1140

(2007); Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc);

Washington Post Co. v. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).

On a motion for summary judgment, the Court must "eschew making credibility determinations

or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## B.  The Free Speech Clause of the First Amendment

The First Amendment provides, in relevant part, that "Congress shall make no law

. . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to

petition the government for a redress of grievances."  U.S. CONST. amend. I.  Demonstration

activities such as those plaintiff wants to engage in are expressive activities involving "speech"

protected by the First Amendment.  See United States v. Grace, 461 U.S. 171, 176 (1983).

Indeed, the activities at issue are core political speech.  See Mahoney v. Babbitt, 105 F.3d 1452,

1455 (D.C. Cir. 1997).  And as the D.C. Circuit has observed, the "general concepts of First

Amendment freedoms are given added impetus as to speech and peaceful demonstrations in

Washington, D.C., by the clause of the Constitution which assures citizens of the right to

assemble peaceably at the seat of government and present grievances."  Quaker Action Group v.

Morton, 460 F.2d 854, 859 (D.C. Cir. 1971) ("Quaker Action III").

15

There are three types of forums that may be implicated in a First Amendment analysis: (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum.  A traditional public forum is one that has traditionally been available for public expression, such as public streets and parks, and any restriction on speech in such a forum is subject to strict scrutiny.  See International Society for Krishna Consciousness v. Lee, 505 U.S. 672, 678 (1992); United States v. Grace, 461 U.S. at 177; Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983); White House Vigil for the ERA Committee v. Clark, 746 F.2d 1518, 1526 (D.C. Cir. 1984).[19]  The D.C. Circuit observed in White House Vigil for the ERA Committee v. Clark, 746 F.2d at 1526 n. 66, that Justice Owen Roberts wrote the "classic statement of the public forum doctrine":

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.  The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general

---

[19]     With respect to the other two types of forums, not at issue in this case:  A designated public forum consists of property not traditionally open for assembly and debate but that has been opened for expressive activity by part or all of the public.  See International Society for Krishna Consciousness v. Lee, 505 U.S. at 678.  It may be either limited or unlimited in character.  See id.  The standards for designated public forums are the same as those governing traditional public forums.  See id.  So long as the designation as public remains, the government "is bound by the same standards as apply in a traditional public forum."  Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46.  All remaining public properties are nonpublic forums, and content-neutral limitations on speech therein must survive "only a much more limited review."  International Society for Krishna Consciousness v. Lee, 505 U.S. at 678-79.

> comfort and convenience, and in consonance with peace and good
> order; but it must not, in the guise of regulation, be abridged or
> denied.

Hague v. Committee for Industrial Organization, 307 U.S. 496, 515-16 (1939) (opinion of

Roberts, J., concurring in the judgment).  The sidewalks of Pennsylvania Avenue and the other

areas at issue in this case are a "quintessential public forum," Mahoney v. Babbitt, 105 F.3d

at 1457, and as such "occupy a privileged position in the hierarchy of First Amendment

jurisprudence."  White House Vigil for the ERA Committee v. Clark, 746 F.2d at 1526-27.

In public forums such as the areas within the Pennsylvania Avenue National

Historic Park at issue in this case, "the government's ability to permissibly restrict expressive

conduct is very limited: the government may enforce reasonable time, place and manner

restrictions as long as the restrictions 'are content-neutral, are narrowly tailored to serve a

significant government interest, and leave open ample alternative channels of communication.'"

United States v. Grace, 461 U.S. at 177 (quoting Perry Education Ass'n v. Perry Local

Educators' Ass'n, 460 U.S. at 45 and citing Heffron v. International Society of Krishna

Consciousness, 452 U.S. 640, 647, 654 (1981); Grayned v. City of Rockford, 408 U.S. 104, 115

(1972); and Cox v. Louisiana, 379 U.S. 559 (1965)); see also Clark v. Community for Creative

Non-Violence, 468 U.S. 288, 293 (1984); Community for Creative Non-Violence v. Kerrigan,

865 F.2d 382, 387 (D.C. Cir. 1989); White House Vigil for the ERA Committee v. Clark, 746

F.2d at 1527.

"The principal inquiry in determining content neutrality, in speech cases generally

and in time, place, or manner cases in particular, is whether the government has adopted a

regulation of speech because of disagreement with the message it conveys."  Ward v. Rock

17

Against Racism, 491 U.S. 781, 791 (1989).  "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"  Id. (internal citations omitted).

The "'narrowly tailored' portion of the time place or manner test requires that there be a *real nexus* between the challenged regulation and the significant governmental interest sought to be served by the regulation."  Community for Creative Non-Violence v. Kerrigan, 865 F.2d at 389 (emphasis in original).  "It is not enough that a regulation is facially reasonable, or that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored *to substantially serve* a significant governmental interest."  Id. (emphasis in original).

In contrast to content-*neutral* time, place or matter restrictions, any content-*based* restriction on political speech in a public forum "must be subjected to the most exacting scrutiny."  Boos v. Barry, 485 U.S. 312, 322 (1988); see also Mahoney v. Babbitt, 105 F.3d at 1455.  In such cases, the government must show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  Boos v. Barry, 485 U.S. at 322.   Additional restrictions beyond reasonable time, place and manner restrictions "such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest."  United States v. Grace, 461 U.S. at 177 (citing Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45; Widmar v. Vincent, 454 U.S. 263 (1981)).  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 828 (1995).  "Our tradition of free speech commands

that a speaker who takes to the street corner to express his views . . . should be free from interference by the State based on the content of what he says." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 578 (1995).  Moreover, "'regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'"  Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 135 (1992) (quoting Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984)).

Restrictions on the basis of a particular viewpoint are even more suspect than viewpoint-neutral content-based restrictions.  When the government targets particular viewpoints taken by speakers, "the violation of the First Amendment is all the more blatant."  Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. at 829.  Viewpoint discrimination is "an egregious form of content discrimination," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional."  Id.  The government therefore violates the First Amendment where it "denies access to a speaker solely to suppress the point of view [the speaker] espouses on an otherwise includible subject."  Cornelius v. NAACP, 473 U.S. 788, 806 (1985).  The Supreme Court has observed:

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.  And it may not select which issues are worth discussing or debating in public facilities.  There is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard.  Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.

Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 96 (1972) (footnote omitted) (holding

that the government may not allow picketing on one topic while prohibiting it on other topics).

In short, "no court will tolerate any attempt to discriminate among protestors on the basis of

viewpoint or subject matter."  White House Vigil for the ERA Committee v. Clark, 746 F.2d

at 1527.

### C.  Permitting System

"Although there is a 'heavy presumption' against the validity of a prior restraint,

the [Supreme] Court has recognized that government, in order to regulate competing uses of

public forums, may impose a permit requirement on those wishing to hold a march, parade, or

rally[.]"  Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130 (citing Bantam Books,

Inc. v. Sullivan, 372 U.S. 58, 70 (1963)).  "Such a scheme, however, must meet certain

constitutional requirements.  It may not delegate overly broad licensing discretion to a

government official.  Further, any permit scheme controlling the time, place, and manner of

speech must not be based on the content of the message, must be narrowly tailored to serve a

significant governmental interest, and must leave open ample alternatives for communication."

Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130 (internal citations omitted) (citing

Bantam Books, Inc. v. Sullivan, 372 U.S. at 70; Cox v. New Hampshire, 312 U.S. at 574-76;

Freedman v. Maryland, 380 U.S. 51, 56 (1965); and United States v. Grace, 461 U.S. at 177).

The government "bears the burden of justifying its restrictions."  Board of Trustees of the State

University of New York v. Fox, 492 U.S. 469, 480 (1989); see also ISKCON of Potomac, Inc. v.

Kennedy, 61 F.3d 949, 959 (D.C. Cir. 1995) (Opinion of Ginsburg, J., concurring in part and

dissenting in part).

This Court and the District of Columbia Circuit previously have had occasion to consider various aspects of NPS regulations governing federal parklands within the capital city, particularly when those regulations have conflicted with the rights of citizens to engage in political speech.  In a case challenging a previous iteration of the NPS regulations governing federal parkland in Washington, D.C., which at that time exempted National Park Service sponsored events – in that case, the Christmas Pageant of Peace – from the permitting rules governing non-NPS events – there, an anti-war display by Women Strike for Peace – Judge J. Skelly Wright observed:

> [T]he Government's regulations do discriminate between applicants on a constitutionally unacceptable basis.  Whereas all other events require permits before they can be held, NPS events are permitted to proceed without a permit.  Furthermore, NPS events  – unlike all other events – are permitted to preempt an entire park area.  Taken together, these two provisions mean that the Government-sponsored displays are always given preference over other displays which do not meet with the approval of Government officials.  Such discrimination cannot be analogized to evenhanded enforcement of the rules of the road.  It constitutes instead the kind of blatant government censorship which the framers of the First Amendment intended to outlaw forever.

Women Strike for Peace v. Morton, 472 F.2d 1273, 1293 (D.C. Cir. 1972) (footnotes omitted) (Opinion of Wright, J., concurring in a per curiam affirmance of the district court's order granting injunctive relief to the plaintiffs).[20]  Under Women Strike for Peace, therefore, NPS

---

[20]      Another member of the panel, Judge Harold Leventhal, explicitly agreed with Judge Wright that the government's park use regulations were "unconstitutionally discriminatory and overbroad" in light of this preference for NPS sponsored or co-sponsored events over all other events.  See Women Strike for Peace v. Morton, 472 F.2d at 1294-95 (Opinion of Leventhal, J., concurring in a per curiam affirmance of the district court's order granting injunctive relief to the plaintiffs).  Judge Roger Robb, the third member of the panel, agreed that "[i]f structures on park land are allowed then permission must be granted with an even hand."  Women Strike for Peace v. Morton, 472 F.2d at 1304 (Opinion of Robb, J., concurring in a per

must subject itself to the same permitting regulations as other applicants for permits.

A few years later, the court of appeals reminded NPS that the provisions of any permitting system – which is by definition a prior restraint on activity protected by the First Amendment – must be "enforced uniformly and without discrimination. . . [T]here will be no deviation from the regulation's language that works an abridgement of communication by the applicant group." Quaker Action Group v. Morton, 516 F.2d 717, 727 (D.C. Cir. 1975) ("Quaker Action IV") (affirming in part district court decision upholding permit regulations, but modifying specifics).

With respect to the discretion of a licensing or permitting official, the Supreme Court has explained that a "government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.  To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130-31 (internal citations and quotations omitted) (citing Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. at 649; Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969); Niemotko v. Maryland, 340 U.S. 268, 271 (1951); Cantwell v. Connecticut, 310 U.S. 296, 305 (1940); and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)); see also Thomas v. Chicago Park District, 534 U.S. 316, 323 (2002) ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will

_____

curiam affirmance of the district court's order granting injunctive relief to the plaintiffs).

22

favor or disfavor speech based on its content."). A "prior restraint without adequate standards is precisely the sort of abuse against which the First Amendment was primarily directed." Women Strike for Peace v. Morton, 472 F.2d at 1286 (Opinion of Wright, J.).

Since the sidewalks abutting Pennsylvania Avenue became federal lands in 1996, members of this Court have been called upon to apply these principles when faced with disputes about the rights of protesters on Inauguration Day – every four years, without fail. See, e.g., Mahoney v. Babbitt, Civil Action No. 96-2827 (Greene, J.) (1997 Inauguration of President William Jefferson Clinton); International Action Center v. United States, Civil Action No. 01-0072 (Kessler, J.) (2001 Inauguration of President George W. Bush); A.N.S.W.E.R. Coalition v. Norton, Civil Action No. 05-0071 (Friedman, J.) (the case at bar, 2005 Inauguration of President George W. Bush).

In Mahoney v. Babbitt, persons seeking to protest at the second Inauguration of President Bill Clinton sought a preliminary injunction against the Park Service. See Mahoney v. Babbitt, 105 F.3d at 1453-55. Judge Harold Greene denied the request for a preliminary injunction, and the plaintiffs appealed. Writing for the D.C. Circuit, Judge Sentelle characterized one set of the Mahoney plaintiffs' arguments as follows:

> [Plaintiff protestors] argue that the asserted inconsistency of their use of the sidewalk area with that of the prior and subsequent permittees is a pretext and further that the previous applications did not comply with the regulations and should not have been considered in any event. For example, while the regulations require a "fully executed prior application" as a basis for the denial provisions of 36 C.F.R. § 7.96(g)(4)(iii)(A), NPS's application to itself that was used in the ouster of appellants was incomplete in that it was undated, did not state the maximum number of participants as required by the regulation, and did not state whether equipment would be installed in the area under permit.

23

> Furthermore, while the regulations permit a duration of no more
> than seven days, the NPS application to itself covered the period
> from November 1, 1996, to April 1, 1997, and presumably would
> oust appellants from that entire time frame.  See 36 C.F.R.
> § 7.96(g)(5)(iv)(A)-(B).  Appellants argued that their ouster from
> the sidewalk area under cover of that less than perfect application
> was a contrived cover for viewpoint-based discrimination, and that
> they should have been permitted to participate as a "reasonably
> permitt[ed] multiple occupancy" of the area covered by the
> permits[.]

Mahoney v. Babbitt, 105 F.3d at 1455.  The court of appeals *specifically declined to address*

*these arguments*, relating to the alleged permitting violations themselves, because of the

emergency basis on which the court reviewed, and reversed, the district court's denial of the

preliminary injunction.  See id.[21]  These arguments, however, foreshadow some of those made by

ANSWER in this case.

One question in this case is whether the *practices and procedures* engaged in by

the NPS to reserve most of the Pennsylvania Avenue sidewalks for the PIC in 2005 were

themselves a violation of the First Amendment, insofar as they deviated from the permitting

regulations promulgated by NPS and published in the Code of Federal Regulations in order to

favor the permit application that NPS submitted on behalf of the PIC (Count I).  Another

question is how much, if any, of the Pennsylvania Avenue sidewalks can be reserved for the

exclusive use of the government and its ticketed guests on Inauguration Day, and how much must

---

[21]   Specifically, the court of appeals reversed the portion of the district court's
opinion "which permitted [the government] to bar groups of twenty-five or fewer of [appellant
protesters] from engaging in sign bearing protests against the policies of the Clinton
Administration on the sidewalks of Pennsylvania Avenue during the second Inaugural Parade[.]"
Mahoney v. Babbitt, 105 F.3d at 1460.

be left open so that any peaceful speakers may be granted access regardless of viewpoint or message (Count III).

## III.  DISCUSSION

### A.  Count I – Permitting Violations

The Court will grant plaintiff's motion for summary judgment on Count I of the Amended Complaint and deny defendants' motion for summary judgment with respect to Count I. The Court concludes that the permitting system is not being "enforced uniformly and without discrimination" and that, contrary to the mandate from our court of appeals in Quaker Action IV, there was a "deviation from the regulation's language that works an abridgement of communication by the applicant group."  Quaker Action Group v. Morton, 516 F.2d at 727.  The Court also concludes that the government's reading of the Presidential Inaugural Ceremonies Act has no foundation in the language of the statute, and that the government's interpretation of the powers purportedly granted to it by the PICA results in impermissible "overly broad licensing discretion" for the NPS.  Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130; see also id. at 135 ("This Court has held time and time again: 'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'") (quoting Regan v. Time, Inc., 468 U.S. at 648-49) (other citations omitted); Quaker Action Group v. Morton, 516 F.2d at 728 (permitting regulations must be "precise in order to minimize the possibility of any inadvertent or deliberate abuse of official discretion.").

1.  Regulatory and Statutory Framework

Under the applicable NPS regulations, there are two types of events that take place on parklands in the National Capital Region, both of which require permits issued by NPS: "demonstrations" and "special events."  36 C.F.R. § 7.96(g)(1)-(2).

The "term 'special events' includes sports events, pageants, celebrations, historical reenactments, regattas, entertainments, exhibitions, parades, fairs, festivals and similar events (including such events presented by the National Park Service), which are not demonstrations under paragraph (g)(1)(i) of this section, and which are engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers."  36 C.F.R. § 7.96(g)(1)(ii).  The Inaugural Parade, organized by the PIC, is a "special event."  See November 12, 2003 NPS Application.

"The term 'demonstrations' includes demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.  This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers."  36 C.F.R. § 7.96(g)(1)(i).  The activities engaged in by plaintiff during Inaugural celebrations are "demonstrations."

Under the regulations, with a few exceptions not relevant to this case, both "demonstrations and special events may be held only pursuant to a permit issued in accordance with [the regulations]."  36 C.F.R. § 7.96(g)(2).  Permit applications must be submitted at least 48 hours in advance of a proposed demonstration or special event.  See 36 C.F.R. § 7.96(g)(3).

There is no limit prescribed *in the regulations* regarding the maximum amount of time *before* a demonstration or special event a permit application may be submitted.

Paragraph (g)(3) of the regulation provides that "[a]ll demonstration applications . . . are deemed granted, subject to all limitations and restrictions applicable to said park area, unless denied within 24 hours of receipt.  However, where a permit has been granted, or is deemed to have been granted pursuant to this subsection, the Regional Director may revoke that permit *pursuant to paragraph (g)(6) of this section*."  36 C.F.R. § 7.96(g)(3) (emphasis added).

Paragraph (g)(6), in turn, provides that a "permit issued for a demonstration is revocable *only* upon a ground for which an application therefor would be subject to denial under paragraphs (g)(4) or (5) of this section. Any such revocation, prior to the conduct of the demonstration, shall be in writing and shall be approved by the Regional Director."  36 C.F.R. § 7.96(g)(6) (emphasis added).  A "permit may be denied in writing by the Regional Director upon the following grounds: (A) A fully executed prior application for the same time and place has been received, and a permit has been or will be granted authorizing activities which do not reasonably permit multiple occupancy of the particular area[.]"  36 C.F.R. § 7.96(g)(4)(iii).

Paragraph (g)(4) provides that "[p]ermit applications for demonstrations and special events are processed in order of receipt, and the use of a particular area is allocated in order of receipt of fully executed applications, subject to the limitations set forth in this section. Provided, however, that the following national celebration events have priority use of the particular park area during the indicated period[,]" including the "White House sidewalk and Lafayette Park, exclusive of the northeast quadrant, for the exclusive use of the Inaugural Committee on Inauguration Day."  36 C.F.R. § 7.96(g)(4)(i).  The regulations do not mention the

27

sidewalks of Pennsylvania Avenue along the parade route or the other areas at issue in this lawsuit as having exclusive or priority use by the Inaugural Committee during the Inauguration.

Paragraph (g)(5) provides that "[n]o permit will be issued authorizing demonstrations or special events in excess of the time periods set out below:  Provided, however, that the stated periods will be *extended for demonstrations only*, unless another application requests use of the particular area and said application precludes double occupancy . . . [for] all other park areas:  Three weeks."  36 C.F.R. § 7.96(g)(5)(iv) (emphasis added).

The Presidential Inaugural Ceremonies Act provides: "With the approval of the officer having jurisdiction over any of the Federal reservations or grounds in the District of Columbia, the Secretary of the Interior may grant to the Inaugural Committee a permit to use the reservations or grounds during the inaugural period, including a reasonable time before and after the inaugural period."  36 U.S.C. § 503(a).  The "inaugural period" is defined as five calendar days before and four calendar days after the Inauguration.  See 36 U.S.C. § 501(2).

2.  Analysis

Plaintiff asserts that "the law is clear and well established that the NPS is constitutionally obligated to subject itself, when it applies for a permit within the regular permit system, and all other applicants to the same rules and regulations without discrimination."  Pl's Mot. at 5.  Plaintiff continues: "When it comes to the Inauguration, however, the NPS refuses to enforce its permitting system in a uniform manner, insists on discriminating to favor the President's Inaugural Committee, and deviates from the permitting regulations in a manner that abridges the free speech, petition and assembly activities of the plaintiff."  Pl's Mot. at 5-6.

Plaintiff then argues: "Permitting systems and practices are unconstitutional if not applied in a non-discriminatory manner *or* if the restrictions fail to serve a significant government interest *or* if they fail to be narrowly tailored *or* if they fail to leave open ample alternatives for communication. The failure to satisfy any single prong of these tests renders a permitting system or practice unconstitutional." Pl's Mot. at 24 (citing Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45; United States v. Grace, 461 U.S. at 177; Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130; Ward v. Rock Against Racism, 491 U.S. at 781; Clark v. Community for Creative Non-Violence, 468 U.S. at 293) (emphasis in original).

Plaintiff is not challenging the constitutionality of the permitting system as written in the regulations. Rather, plaintiff challenges the *deviation* by NPS from that carefully crafted system in order to afford preferential treatment to supporters of the government over those who seek access to a public forum to criticize the government on Inauguration Day. See Pl's Mot. at 24. Plaintiff's "primary challenge . . . is that the manner of issuance of the permit to PIC was unconstitutional, as was the revocation of ANSWER's permit." Pl's Reply at 12. Plaintiff argues that the granting of the PIC's permit was a violation of the express terms of the NPS regulations and of NPS policy because the application accepted by NPS on behalf of the PIC – and then granted by NPS – was submitted more than a year in advance, it was incomplete, and the duration of the event was longer than that allowed by regulation. See Pl's Mot. at 28-29. The Court agrees with plaintiff that NPS violated its own regulations in its treatment of the special event permit application that NPS submitted to itself on behalf of the PIC, specifically with respect to the duration of the special event and the related timing of the submission of the application. The Court therefore grants plaintiff's motion for summary judgment on Count I.

29

Defendants assert that the departures from the regular permitting system are authorized by the Presidential Inaugural Ceremonies Act.  <u>See</u> Defs' Reply at 28.  They argue that "in granting PIC's permit, the Park Service neither violated its own regulations nor policy, as PIC is accorded special status under the Presidential Inaugural Ceremonies Act, 36 U.S.C. § 503." Defs' Mem. at 3.[22]

The government argues that the PIC's special event permit application was granted because it was received first, which entitles the PIC, as the first applicant in the door, to preference under the applicable regulations.  <u>See</u> Defs' Reply at 24 (citing 36 C.F.R. § 7.96(g)(4)(i)).  It acknowledges that the Park Service has a policy of only "accepting permit applications no farther in advance than one year from the dates sought to [be] included in a permit, and that the regulations provide that a special event permit may be granted for three weeks."  Defs' Mem. at 26.  The government argues that "plainly the PIC formed after the 2004 election needed a reasonable amount of time before January 20th in which to prepare the massive undertaking that the Inauguration on January 20th entails."  <u>Id</u>.  The government maintains that the PIC permit application was *not* submitted more than a year in advance of the start date of the event because the application was submitted on November 12, 2003 and the start date for the

---

[22]     As noted above, the Presidential Inaugural Ceremonies Act provides:

> With the approval of the officer having jurisdiction over any of the Federal reservations or grounds in the District of Columbia, the Secretary of the Interior may grant to the Inaugural Committee a permit to use the reservations or grounds during the inaugural period, including a reasonable time before and after the inaugural period.

36 U.S.C. § 503(a).  It further provides that the "inaugural period" is five calendar days before and four calendar days after the Inauguration.  <u>See</u> 36 U.S.C. § 501(2).

Inauguration special event was November 1, 2004, because of the setup time defendants included. See id. at 28.

The duration of the PIC special event permit was five months, from November 1, 2004 to April 1, 2005. See November 12, 2003 NPS Application. As the government acknowledges, under the regulations permits may not be granted for a duration of more than three weeks. See 36 C.F.R. § 7.96(g)(5)(iv). The regulations explicitly provide that under certain circumstances, *demonstration* permits may be granted for a duration exceeding three weeks, but that exception does not apply to special event permits. See id. It is only because the NPS assumes that the three-week duration limit does not apply to the PIC – as a result of the PICA – that the application submitted by NPS on behalf of the PIC was not refused as a result of its submission more than a year in advance of the start date of the event. See Defs' Mem. at 26-27 ("And the Presidential Inaugural Ceremonies Act . . . would control any regulatory time limitation that could otherwise seem applicable to a permit for the Inauguration."). It is this assumption that the Court concludes is impermissible.

Defendants attempt to justify this preferential treatment for the PIC by noting that the Presidential Inaugural Ceremonies Act provides that the PIC's Inauguration special event permit may be for "a reasonable time before and after the inaugural period." 36 U.S.C. § 503(a). The "inaugural period" itself is defined by statute as five calendar days before and four calendar days after the Inauguration. See 36 U.S.C. § 501(2). Defendants argue that the five-month period of the PIC's special event permit application is a "reasonable time before and after the Inaugural period" within the meaning of the PICA, and that the three week duration limitation in the regulations therefore does not apply to the PIC special event permit. See Defs' Reply at 27-28.

31

Plaintiff agrees that this is the primary issue with respect to Count I, framing the question as "whether the PICA overrides the subsequent D.C. Circuit rulings that mandate the NPS to uniformly apply its regular permitting system, including to permit applications filed by itself or for events it co-sponsors."  Pl's Reply at 2.  That is indeed the relevant question, and the answer is plain.

As plaintiff points out, the PICA "is hardly the *carte blanche* the government makes it out to be."  Pl's Reply at 21.  Nothing within the PICA purports to address issues relating to "demonstrators or the constitutional standards to which NPS is subject with respect to the First Amendment."  Pl's Mot. at 33.  Nowhere in the PICA does Congress explicitly exempt or purport to exempt the NPS or the Presidential Inaugural Committee from the regular permitting process provided for in the regulations, 36 C.F.R. § 7.96(g).  Nor does anything in the statute indicate that it was the intent of Congress to exempt the PIC from the regulations governing special events and demonstrations in the federal parklands.  Thus, defendants' argument that the PICA exempts the government from complying with the permitting process laid out painstakingly in 36 C.F.R. § 7.96(g) must rest on an *implicit* exemption.  In light of the D.C. Circuit precedent holding that a regulation that *explicitly* exempted NPS from the requirements of the permitting regulations was unconstitutional, the Court is unable to conclude that the language in the PICA on which the government relies *implicitly* has that same impermissible effect.  See Women Strike for Peace v. Morton, 472 F.2d at 1293 (Opinion of Wright, J.); see also Quaker Action Group v. Morton, 516 F.2d at 727.  Congress could not by statute expressly exempt the National Park Service or the Presidential Inaugural Committee from compliance with the First Amendment.  The Court is even more unwilling to infer such an impermissible Congressional intent from a statute that does not

32

speak directly to the issue.

Under the defendants' reading of the statute, the purported waiver by the PICA of the three-week time limit found in the regulations – solely for the NPS/PIC and no one else – has the effect that the permit application submitted by NPS to itself on behalf of the yet-to-be-formed PIC would *always* be the first permit application received.  That is fundamentally discriminatory. If the Court were to credit the government's interpretation of the statute, the NPS/PIC application can be submitted one year before "a reasonable time" period before the Inauguration – and the NPS unilaterally determines what constitutes a "reasonable time."  Meanwhile, demonstration permits can only be submitted a year before an Inauguration demonstration that may last, at maximum, three weeks.  Such a system – used by the defendants with respect to the 2005 Inauguration – demonstrates a preference for the government over all other speakers.  Such a preference is constitutionally impermissible.  See Quaker Action Group v. Morton, 516 F.2d at 727 ("the premise of our holding [upholding various aspects of NPS regulations] is that the provisions of the permit system will be enforced uniformly and without discrimination and that there will be no deviation from the regulation's language that works an abridgement of communication by the applicant group."); Women Strike for Peace v. Morton 472 F.2d at 1293 (Opinion of Wright, J.) (when "Government-sponsored displays are always given preference over other displays which do not meet with the approval of Government officials" there is not "evenhanded enforcement of the rules of the road.").

Such a system also delegates impermissible discretion to NPS in the permitting system with respect to the meaning of the term "a reasonable time" under the PICA.  See Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130 (permitting schemes "may not delegate

overly broad licensing discretion to a government official"); see also Thomas v. Chicago Park District, 534 U.S. at 323 (same); Women Strike for Peace v. Morton 472 F.2d at 1293 (Opinion of Leventhal, J.) (an "official regulatory scheme that empowers regulatory officials to pick and choose among those seeking to use public facilities for communicative activity, without providing narrowly drawn standards for the exercise of official discretion" are "condemn[ed]" as "an invalid prior restraint") (citing Niemotko v. Maryland, 340 U.S. 268 (1951); Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); Kunz v. New York, 340 U.S. 290 (1951); and Police Department of Chicago v. Mosley, 408 U.S. 92 (1972)).  If the government thinks it appropriate to lengthen the amount of time for which permits may be granted under the regulations – perhaps even only for the Inauguration period and no other time – the government may explicitly amend the regulations that apply to *all* permit applicants.  The government may not, however, simply conclude that because of its interpretation of a phrase in a statute – "a reasonable time" – the existing policies and regulations apply as written to some applicants, such as plaintiff, and not to others, such as the PIC.

In sum, the Court concludes that the permitting system, in the context of Inaugural events and demonstrations relating to the Inauguration, is not being "enforced uniformly and without discrimination" and that, contrary to the mandate from our court of appeals in Quaker Action IV, there has been a "deviation from the regulation's language that works an abridgement of communication by the applicant group." Quaker Action Group v. Morton, 516 F.2d at 727. The government's interpretation of the powers granted to it by the PICA also gives impermissible discretion to the NPS.  See Forsyth County, Ga. v. Nationalist Movement, 505 U.S. at 130.  The Court therefore will grant plaintiff's motion for summary judgment on Count I of the Amended

Complaint, and it will deny defendants' motion for summary judgment with respect to Count I.

### B.  Count III – Access to the Parade Route

The government moved to dismiss or, in the alternative, for summary judgment on Count III.  Plaintiff did not move for summary judgment on Count III.  The government continues to argue that plaintiff is not entitled to "insert itself into PIC's permitted activities."  Defs' Mem. at 31.  The government asserts that the "Park Service acts to ensure that groups or individuals obtaining a permit for a demonstration or special event may express their views free from interference or unwarranted intrusion from other groups or individuals."  Id. at 32.  Plaintiff argues in response that there "may be nothing more repugnant to the First Amendment than the government excluding from vast areas along the Inaugural parade route all those whose views fail to conform to that of a particular political group or who are excluded because they have not been hand-picked by the President's representatives to be allowed to stand on the sidewalks of Pennsylvania Avenue with an ability to view or communicate with the Inaugural parade."  Pl's Mem. at 17.

The government cites a number of cases for the proposition that a "physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it might appear.  As such, it is an interference with the rights of other citizens to enjoy the event or demonstration in which they have chosen to participate, and in an area reserved for them."  Defs' Mem. at 33 (quoting Sanders v. United States, 518 F. Supp. 728, 730 (D.D.C. 1981), *aff'd without opinion*, 679 F.2d 262 (D.C. Cir. 1982) and citing Hurley v. Irish-American Gay, Lesbian and Bisexual

Group of Boston, 515 U.S. at 578; Kroll v. United States Capitol Police, 847 F.2d 899 (D.C. Cir. 1988); and Torossian v. Hayo, 45 F. Supp. 2d 63, 67 (D.D.C. 1999)).

The cases cited by the government are not only completely unpersuasive, they are only marginally even relevant. Hurley discussed the First Amendment in the context of direct participation in a *privately* organized parade. The plaintiffs in that case were seeking the right to participate in the private parade itself – not to protest in adjacent public forums. As the D.C. Circuit has held, Hurley is completely irrelevant – "not remotely parallel" – for purposes of analyzing the First Amendment rights of protesters on sidewalks in the context of the Inauguration. See Mahoney v. Babbitt, 105 F.3d at 1456 ("There are two distinctions between Hurley and this case which are so critical as to make the cases not remotely parallel."). Kroll is a case about qualified immunity rather than the First Amendment. See Kroll v. United States Capitol Police, 847 F.2d at 902 (The "sole issue on appeal is whether this aspect of First Amendment law was so 'clearly established' . . ."). As for Torossian, it also discussed qualified immunity for purported violations of the First Amendment rights of counter-protesters during a private event, the Million Man March, rather than a public event. See Torossian v. Hayo, 45 F. Supp. 2d at 64.

The Inauguration is *not a private event*. See Mahoney v. Babbitt, 105 F.3d at 1458. Nor are plaintiff's members seeking the right to participate in the Inaugural parade itself. The interest the government asserts here, and the citation to Sanders, are very similar to an asserted interest that was *entirely rejected* by the court of appeals in Mahoney. Writing for a unanimous panel, Judge Sentelle explained:

[T]he government has offered no compelling governmental interest

and no convincing argument that its policy was narrowly crafted to achieve such a legitimate end.  *Indeed, the only justification offered for barring groups of demonstrators of twenty-five or fewer is that their presence on the Pennsylvania Avenue sidewalks would constitute a "physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs."*  Government Brief at 12.  The goal of the government to prevent that action on appellants' part hardly constitutes a compelling state interest, or, in the face of the First Amendment, any legitimate state interest at all . . . . It is only the "purpose of injecting [their] own convictions or beliefs" that causes the government to exclude them.  But it is also the appellants' desire to "interject" their own convictions and beliefs that entitles them to the protection of the First Amendment.  *If the free speech clause of the First Amendment does not protect the right of citizens to "interject" their own convictions and beliefs into a public event on a public forum then it is difficult to understand why the Framers bothered including it at all.*

Mahoney v. Babbitt, 105 F.3d at 1458-59 (emphasis added).  In other words, protesters are entitled to engage in political speech in a public forum during the Inaugural parade.  As the Supreme Court has observed, the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  Police Dep't of City of Chicago v. Mosley, 408 U.S. at 96.  "And it may not select which issues are worth discussing or debating in public facilities.  There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard.  Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."  Id. (footnote omitted).

The National Park Service on behalf of the PIC cannot reserve *all* of Pennsylvania Avenue for itself, leaving only the Ellipse and the northern part of John Marshall Park to protesters.  See Mahoney v. Babbitt, 105 F.3d at 1458.  That proposition having been recognized

37

by the court of appeals in <u>Mahoney</u> – and not being the least bit qualified by the irrelevant cases cited by the government – the question now is this: How much, if any, of the Pennsylvania Avenue sidewalks can be reserved for the exclusive use of the government and its ticketed guests on Inauguration Day, and how much must be left open for any peaceful speaker or demonstrator to have access regardless of viewpoint or message?[23]

The government is not entitled to judgment as a matter of law on Count III.  The Court therefore will deny defendants' motion for summary judgment with respect to Count III of the amended complaint.  Plaintiff is invited either to file its own motion for summary judgment on Count III, or to request a trial date.

An Order consistent with this Opinion will be issued this same day.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 20, 2008

---

[23]    The Court also doubts that the five month duration of the permit, in violation of an existing regulation, could satisfy the narrow tailoring requirement.  <u>See</u> <u>Mahoney v. Babbitt</u>, 105 F.3d at 1458 ("NPS, however . . . issued itself a permit not for a limited segment of the Pennsylvania Avenue sidewalks for the time of the Parade, but for the entire length of Pennsylvania Avenue sidewalks *for a five-month period, a time frame more than twenty times as long as permitted under its own regulation.*  There can be no doubt that the standard of narrow tailoring to meet a compelling state interest applies and has been violated.") (emphasis added). The government has failed to show that it has a compelling state interest *or* that its actions were narrowly tailored.