UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
A.N.S.W.E.R. COALITION,                                     )
                                                           )
          Plaintiff,                                       )
                                                           )
     v.                                                    )          Civil Action No. 05-0071 (PLF)
                                                           )
SALLY JEWELL, Secretary,                                   )
  United States Department of the Interior, <u>et al.</u>,     )
                                                           )
          Defendants.                                      )
—————————————————————— )


<u>OPINION</u>

          Plaintiff A.N.S.W.E.R. (Act Now to Stop War and End Racism) Coalition

("ANSWER") filed this lawsuit in January 2005 against the Secretary of the Interior, the

Director of the National Park Service (collectively "NPS"), and the Director of the Secret

Service, an agency within the Department of Homeland Security ("Secret Service"), challenging

the constitutionality of certain policies that restrict ANSWER's ability to engage in expressive

activity during the Presidential Inaugural Parade in Washington, D.C.[1]  This matter is before the

Court on the Secretary of the Interior and National Park Service's motion to dismiss Count I and

for summary judgment on Counts III and IV, the Secretary of Homeland Security's motion for

---

          [1]          Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court
substitutes as defendants the current Secretary of the Interior, Sally Jewell, for former Secretary
Ken Salazar, the current Director of the National Park Service, Jonathan B. Jarvis, for former
Director Fran Mainella, the current Director of the Secret Service, Joseph Clancy, for former
Director Mark Sullivan, and the current Secretary of Homeland Security, Jeh Johnson, for former
Acting Secretary Rand Beers.

summary judgment on Count II, plaintiff ANSWER's cross-motions for summary judgment on Counts II, III, and IV, and plaintiff ANSWER's motion to strike.[2]

The Court heard oral argument on these motions on October 22, 2015.  After carefully considering the parties' papers, the relevant legal authorities, the arguments presented by counsel, and the history of and record in this case, the Court grants summary judgment to the defendants on Counts II, III, and IV.  The Court also denies defendants' motion to dismiss Count I and grants ANSWER's motion to strike.

---

[2]     The papers reviewed in connection with the pending motions include:  plaintiffs' amended complaint ("Am. Compl.") [Dkt. No. 17]; plaintiffs' supplemental pleading ("Supp. Pleading") [Dkt. No. 144]; NPS' motion to dismiss in part and motion for summary judgment re Counts III and IV ("NPS Mot.") [Dkt. No. 174]; NPS' statement of material facts ("NPS Stmt.") [Dkt. No. 174]; declaration of Robbin M. Owen, NPS' Chief of the Division of Permits Management, National Mall and Memorial Parks in the National Capital Region ("Owen Decl.") [Dkt. No. 171-1]; plaintiffs' opposition and cross-motion for summary judgment re Counts III and IV ("Pl. Opp. & Cross-Mot. re Counts III and IV") [Dkt. No. 183]; plaintiffs' statement of material facts re Counts III and IV ("Pl. Stmt. re Counts III and IV") [Dkt. No. 183]; NPS' opposition to plaintiff's cross-motion and reply in support its motion for summary judgment re Counts III and IV ("NPS Opp. & Reply") [Dkt. Nos. 206]; NPS's response to plaintiffs' statement of material facts ("NPS Resp.") [Dkt. No. 206-1]; plaintiff's reply in support of its cross-motion for summary judgment ("Pl. Reply re Count III and IV") [Dkt. No. 210]; plaintiff's motion to strike ("Pl. Mot. to Strike") [Dkt. No. 182]; NPS' opposition to plaintiff's motion to strike ("NPS Opp. to Mot. to Strike") [Dkt. No. 193]; plaintiff's reply in support of its motion to strike ("Pl. Reply re Mot. to Strike") [Dkt. No. 209]; Secret Service's motion for summary judgment ("Secret Serv. Mot.") [Dkt. No. 181]; Secret Service's statement of material facts ("Secret Serv. Stmt.") [Dkt. No. 181]; declaration of Donato Coyer, Special Agent in Charge of the Dignitary Protective Division ("Coyer Decl.") [Dkt. No. 181-1]; deposition of William J. Callahan, deputy assistant director in the Office of Protective Operations for the Secret Service ("Callahan Dep.") [Dkt. No. 181-5]; plaintiffs' opposition and cross-motion for summary judgment re Count II ("Pl. Opp. & Cross-Mot. re Count II") [Dkt. No. 204]; plaintiff's statement of material facts re Count II ("Pl. Stmt. re Count II") [Dkt. No. 204]; Secret Service's opposition to plaintiffs' cross-motion and reply in support of its motion for summary judgment on Count II ("Secret Serv. Opp. & Reply") [Dkt. No. 211]; Secret Service's response to plaintiff's statement of material facts ("Secret Serv. Resp.") [Dkt. No. 211-1]; and plaintiff's reply in support of its cross-motion for summary judgment ("Pl. Reply re Count II") [Dkt. No. 214].

# I.  BACKGROUND

The pending motions stem from ANSWER's ongoing efforts to secure sufficient space for its members and affiliates to engage in political dissent during the Presidential Inaugural Parade.  This Court has previously described the factual and procedural background of this case.  See A.N.S.W.E.R. Coalition v. Kempthorne, 493 F. Supp. 2d 34, 37-41 (D.D.C. 2007) ("ANSWER I"); A.N.S.W.E.R. Coalition v. Kempthorne, 537 F. Supp. 2d 183, 186-93 (D.D.C. 2008) ("ANSWER II"); A.N.S.W.E.R. Coalition v. Salazar, No. 05-0071, 2012 WL 8667570, at *1-3 (D.D.C. March 5, 2012) ("ANSWER III"); and A.N.S.W.E.R. Coalition v. Salazar, 915 F. Supp. 2d 93, 96-99 (D.D.C. 2013) ("ANSWER IV").  It therefore will limit its discussion accordingly.

ANSWER is an unincorporated grassroots organization that engages in political organizing and activism in opposition to war and racism.  Am. Compl. ¶ 1.  Every four years since 2005, ANSWER has organized or attempted to organize a mass demonstration along Pennsylvania Avenue or in Freedom Plaza to engage in political dissent during the Presidential Inaugural Parade.  Id.; Supp. Pleading ¶ 1.  Counts III and IV of the complaint and supplemental pleading concern National Park Service regulations, as now amended, that grant the Presidential Inaugural Committee ("PIC") exclusive access to some of these same areas in connection with events relating to the Presidential Inauguration.  See 36 C.F.R. § 7.96(g)(4)(iii) (2012).  Count II of the complaint challenges the United States Secret Service's ban on allowing physical supports for signs into the secure areas of Pennsylvania Avenue along the Presidential Inaugural Parade route.

### A. *Statutory and Regulatory Framework*

The Secret Service, a federal law enforcement agency within the Department of Homeland Security, is charged with protecting the President, the Vice President, the President-elect, the Vice President-elect, and the immediate families of those individuals.  18 U.S.C. § 3056(a).  Because the Secretary of the Department of Homeland Security designated the Presidential Inaugural Parade a National Special Security Event, the Secret Service has the responsibility "to ensure the overall operational security of the day."  Coyer Decl ¶ 4.

The Department of the Interior has the authority to issue and implement, through NPS, rules and regulations that oversee the use of federal grounds within the National Park System.  See 54 U.S.C. §§ 100101, 100751.  Pursuant to this authority, NPS has promulgated regulations for a permitting system that allows the use of National Park System land around the national capital region for special events and demonstrations.  See generally 36 C.F.R. § 7.96(g). The Secretary of the Interior has additional statutory authority under the Presidential Inaugural Ceremonies Act ("PICA") to "grant to the Inaugural Committee a permit to use [federal] reservations or grounds during the inaugural period, including a reasonable time before and after the inaugural period."  36 U.S.C. § 503(a).

When ANSWER initiated this suit in 2005, the relevant NPS regulations set aside only the White House sidewalk and three-quarters of Lafayette Park for the exclusive use of PIC for inaugural activities.  36 C.F.R. § 7.96(g)(4)(i)(F) (2005).  The regulations provided that permits for demonstrations and special events in other areas would be issued on a first-come, first-served basis, 36 C.F.R. § 7.96(g)(4)(i), and NPS had a "strict policy" to not "accept any permit applications submitted more than one year in advance of the start date for any event on Park Services land."  ANSWER II, 537 F. Supp. 2d at 186-87.  In practice, however, NPS

4

deviated from its policy and submitted permit applications for itself over a year in advance of

Inauguration Day activities to reserve for PIC over one-third of the sidewalk space on

Pennsylvania Avenue between 4th Street and 15th Street, Northwest, in addition to the Lafayette

Park and White House sidewalk areas set aside by regulation.  See id. at 187, 190.

### B.  Procedural History

ANSWER's amended complaint contained three counts.  The first claim (Count I)

challenged NPS' actions to exempt itself and PIC from the relevant permitting regulations.  Am.

Compl. ¶¶ 87-97.  ANSWER's second claim (Count II) challenged the Secret Service's

prohibition on supports for signs and placards. Id. ¶¶ 98-102.  ANSWER's third claim

(Count III) challenged NPS' policy of granting to PIC exclusive use of space along the parade

route, regardless of whether such policy was inconsistent with NPS' regulations.  Id. ¶¶ 103-08.

ANSWER asserted that the conduct described in each count violated the First Amendment and

the Equal Protection Clause, and requested declaratory and injunctive relief, including a

"[d]eclaratory judgment that the NPS policy and practice of granting to PIC exclusive use of the

public space abutting the Inaugural Parade route is unconstitutional; an injunction prohibiting

such discriminatory conduct in the future; and a mandatory injunction that the NPS make the

sidewalks abutting the Inaugural Parade generally open for the public for use[.]" Am. Compl.

¶ 27.  ANSWER did not challenge the regulatory set-aside of the White House sidewalk and

Lafayette Park.  Id. ¶ 104.

The Court addressed the justiciability of ANSWER's claims in an Opinion and

Order dated June 13, 2007, in which the Court held that ANSWER had both organizational and

representational standing to challenge NPS' then-uncodified policy and practice of granting PIC

exclusive use of public space along the parade route.  See ANSWER I, 493 F. Supp. 2d at 42-48.

NPS then moved for summary judgment on Counts I and III, and ANSWER moved for summary judgment on Count I.  See ANSWER II, 537 F. Supp. 2d at 192-93.[3]  In an Opinion and Order dated March 20, 2008, the Court denied NPS' motion for summary judgment and granted ANSWER's motion for summary judgment on Count I.  See id. at 206.  The Court held that NPS' "policy and practice of exempting itself and/or the [PIC] from compliance with the generally applicable permitting regulations, 36 C.F.R. § 7.96(g), [was] unconstitutional" and enjoined NPS from doing so "with respect to events relating to the Inauguration."  Id.  The Court also denied NPS' motion for summary judgment on Count III.  Noting that the Inauguration is a public event at which protestors have a right to engage in political speech, the Court rejected the government's argument that ANSWER was "not entitled to 'insert itself into PIC's permitted activities.'"  Id. at 204 (internal citation omitted).  The Court did not reach the question of "[h]ow much, if any, of the Pennsylvania Avenue sidewalks can be reserved for the exclusive use of the government and its ticketed guests on Inauguration Day."  Id. at 205-06.

Following the Court's decision, NPS amended its regulations governing permits for demonstrations and special events for Inaugural activities.  See Areas of the National Park System, National Capitol Region, 73 Fed. Reg. 67,739 (Nov. 17, 2008); 36 C.F.R. § 7.96(g)(4) (2012).  The regulations now provide, in relevant part:

> (i) NPS processes permit applications for demonstrations and special events in order of receipt. NPS will not accept applications more than one year in advance of a proposed continuous event (including set-up time, if any). Use of a particular area is allocated in order of receipt of fully executed applications, subject to the limitations in this section.

. . .

---

[3]      Neither party, at that time, moved for summary judgment on Count II, relating to sign supports.  See ANSWER II, 537 F. Supp. 2d at 191.

(iii) In connection with Presidential Inaugural Ceremonies the following areas are reserved for priority use as set forth in this paragraph.

(A) The White House sidewalk and Lafayette Park, exclusive of the northeast quadrant for the exclusive use of the Presidential Inaugural Committee on Inaugural Day.

(B) Portions of Pennsylvania Avenue, National Historic Park and Sherman Park, as designated in the maps included in paragraph (g)(4)(iii)(E) of this section, for the exclusive use of the Presidential Inaugural Committee on Inaugural Day for: (1) Ticketed bleachers viewing and access areas, except that members of the public may use a ticketed bleacher seat that has not been claimed by the ticket holder 10 minutes before the Inaugural Parade is scheduled to pass the bleacher's block[.]

36 C.F.R. § 7.96(g)(4).  The referenced maps show reserved PIC bleacher space on portions of Pennsylvania Avenue between 7th Street and 15th Street, Northwest, including approximately three-quarters of Freedom Plaza (located on Pennsylvania Avenue between 13th Street and 14th Street), and parts of Sherman Park (located at 15th Street and Pennsylvania Avenue).  36 C.F.R. § 7.96(g)(4)(iii)(E).  According to NPS, these regulations grant PIC additional priority and exclusive use of approximately fourteen percent of Pennsylvania Avenue along the Inaugural Parade route.  ANSWER III, 2012 WL 8667570 at *5.

ANSWER subsequently filed a motion to enforce this Court's injunction against NPS on the ground that the amended regulations violated the Court's March 20, 2008 Order.  The Court denied that motion.  ANSWER III, 2012 WL 8667570 at *8.  Although the amended regulations expanded the reach of the regulatory set-aside, the Court found that they did not contravene the terms of the Court's injunction, which merely enjoined NPS' practice of deviating from its then-existing regulations and established policies in order to discriminate in favor of PIC.  Id. at *6-7.  Although the Court concluded that the injunction did not preclude the

7

expansion of the regulatory set-aside, "[t]hat conclusion does not mean that NPS' amended regulations are constitutional; it just means that the Court has not addressed the issue." Id. at *7. The Court then granted ANSWER leave to file a supplemental pleading containing facial and as-applied challenges to 36 C.F.R. § 7.96(g)(4)(iii)(B).  Id. at *8.

### C. ANSWER's Supplemental Pleading

In addition to the three claims set forth in its Amended Complaint, see supra at 4-5, ANSWER presents a fourth claim in its Supplemental Pleading.  It alleges that enforcement of the regulatory set-aside contained in the amended regulations, 36 C.F.R. § 7.96(g)(4)(iii)(B), constitutes identity-based, viewpoint-based and/or content-based discrimination; that there is no compelling purpose served by favoring PIC or the Administration and disfavoring others; and that the challenged exemption does not constitute a reasonable time, place, and manner restriction, all in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment (Count IV).  Supp. Pleading ¶¶ 10, 14, 21-23.  ANSWER challenges the regulations on their face and as applied to ANSWER and its members.  Id. ¶ 15.  Along with the Supplemental Pleading, ANSWER enclosed its application for a permit to conduct a demonstration relating to the 2013 Inauguration, seeking a permit for "Freedom Plaza, [and] sidewalks adjacent to Freedom Plaza."  See id., Attachment 1.  ANSWER also included NPS' confirmation of ANSWER's first-in-time application, in which NPS informed ANSWER of the regulatory priority for certain designated areas at Freedom Plaza relating to the Inaugural Parade, but authorized ANSWER to use a 160-foot by 35-foot-wide segment of the western portion of Freedom Plaza.  See id., Attachment 2.  Although ANSWER's application was "deemed granted," NPS claimed to retain authority to revoke ANSWER's permit for "certain designated areas at Freedom Plaza relating to the Inaugural Parade" that PIC intended to use once it was

formed in November 2012.  Id.  ANSWER now requests declaratory and permanent injunctive

relief and asks the Court to hold 36 C.F.R. § 7.96(g)(4)(iii)(B)(1), as amended, unconstitutional,

enjoin its operative effect, and order NPS to remove from the incorporated regulatory maps those

areas reserved for the "PIC Bleacher area."  Supp. Pleading ¶ 26(a).

In an Opinion and Order dated January 14, 2013, the Court denied NPS' motion

to dismiss ANSWER's Supplemental Pleading for lack of standing.  See ANSWER IV, 915

F. Supp. 2d at 100-04.  The Court held that ANSWER has standing to challenge the PIC

regulatory set-aside in 36 C.F.R. § 7.96(g)(4)(iii)(B)(1), on its face and as applied to ANSWER

and its members.  Id.[4]

## II.  PLAINTIFF'S MOTION TO STRIKE

Before reaching the parties' cross-motions, the Court must resolve an initial

matter — ANSWER seeks to strike from the record one sentence from the Owen Declaration,

submitted by NPS in support of its motion, and a related paragraph in NPS' accompanying

statement of material facts as to which there is no genuine issue.  Pl.'s Reply in Support of its

Mot. to Strike at 1.  The sentence at issue states: "I understand that PIC traditionally sells tickets

for their bleacher seats to help recoup some of their expenses that they incur as being in charge

of the Presidential inaugural ceremony and functions and activities connected with the ceremony

under 36 U.S.C. [§ 501(1)]."  Owen Decl. ¶ 10.[5]  Because this statement is not based on the

---

[4]      "[T]he distinction between facial and as-applied challenges . . . goes to the
breadth of the remedy employed by the Court, not what must be pleaded in a complaint."
Citizens United v. FEC, 558 U.S. 310, 331 (2010).  The relevant legal standards therefore are
"the same for both challenges."  Edwards v. Dist. of Columbia, 755 F.3d 996, 1002 (D.C. Cir.
2014) (citing Legal Aid Servs. Of Or. V. Legal Servs. Corp., 608 F.3d 1084, 1096 (9th Cir.
2010)).

[5]      Paragraph 17 of NPS' Statement of Material Facts, which cites paragraph 10 of
the Owen Declaration, similarly states that "PIC traditionally sells tickets for its bleacher seats to

declarant's personal knowledge as required for a declaration submitted in support of a motion for

summary judgment under Rule 56(c)(4) of the Federal Rules of Civil Procedure, the Court will

grant plaintiff's motion.  The first sentence of paragraph 10 of the Owen Declaration and

paragraph 17 of NPS' Statement of Material Facts therefore are stricken from the record and will

not be considered with respect to the pending motions.

### III.  LEGAL FRAMEWORK

#### A.  *Summary Judgment Standard*

Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Baumann v. Dist. of

Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); FED. R. CIV. P. 56(a), (c).  In making that

determination, the court must view the evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in its favor.  Baumann v. Dist. of Columbia, 795 F.3d at

215; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam); Anderson v. Liberty Lobby,

Inc., 477 U.S. at 255; Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).  A disputed fact is

"material" if it "might affect the outcome of the suit under the governing law."  Talavera v. Shah,

638 F.3d at 308 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  A dispute over a

material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the

nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Grimes v. Dist. of Columbia,

---

help recoup some of PIC's expenses that it incurs for being in charge of the Presidential
inaugural ceremony and the functions and activities connected with the ceremony under 36
U.S.C. § 501(1)."  NPS Stmt. ¶ 10.

794 F.3d 83, 94-95 (D.C. Cir. 2015); Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir. 2012).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge at summary judgment.  Thus,

[the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there

is a genuine issue for trial."  Barnett v. PA Consulting Group, Inc., 715 F.3d 354, 358 (D.C. Cir.

2013) (quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)); see also

Tolan v. Cotton, 134 S. Ct. at 1866; Baumann v. Dist. of Columbia, 795 F.3d at 215; Allen v.

Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015).

### B.  The Free Speech Clause of the First Amendment

The First Amendment provides, in relevant part, that "Congress shall make no law

. . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to

petition the government for a redress of grievances."  U.S. CONST. amend. I.  Demonstration

activities such as those in which plaintiff seeks to engage are expressive activities involving

"speech" protected by the First Amendment.  See United States v. Grace, 461 U.S. 171, 176

(1983).  Indeed, the activities at issue are core political speech.  See Initiative and Referendum

Inst. v. U.S. Postal Serv., 417 F.3d 1299, 1311 (D.C. Cir. 2005) (citing Meyer v. Grant, 486 U.S.

414, 421-22 (1988)).  And, as the D.C. Circuit has observed, the "general concepts of First

Amendment freedoms are given added impetus as to speech and peaceful demonstrations in

Washington, D.C., by the clause of the Constitution which assures citizens of the right to

assemble peaceably at the seat of government and present grievances."  A Quaker Action Group

v. Morton, 460 F.2d 854, 859 (D.C. Cir. 1971) ("Quaker Action III").

There are three types of forums that may be implicated in a First Amendment

analysis:  (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic

forum.  A traditional public forum is one that has traditionally been available for public

expression, assembly, and debate, such as public streets and parks.  See United States v. Grace,

461 U.S. at 177; Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

These places "have immemorially been held in trust for the use of the public and, time out of

mind, have been used for purposes of assembly, communicating thoughts between citizens, and

discussing public questions." Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009).  Such

use of the streets and public places is "a part of the privileges, immunities, rights, and liberties of

citizens." White House Vigil for the ERA Comm. v. Clark, 746 F.2d 1518, 1526 n.66 (D.C. Cir.

1984) (citation omitted).  Freedom Plaza and the sidewalks of Pennsylvania Avenue are

"quintessential public forum[s]," Mahoney v. Babbitt, 105 F.3d 1452, 1457 (D.C. Cir. 1997), that

"occupy a privileged position in the hierarchy of First Amendment jurisprudence." White House

Vigil for the ERA Comm. v. Clark, 746 F.2d at 1526-27.

        In these quintessential public forums, the government may not prohibit all

communicative or expressive activity.  Perry Education Ass'n v. Perry Local Educators Ass'n,

460 U.S. at 45.  The government may, however, regulate speech in these forums through the

promulgation of rules and regulations, and it may require permits for the exercise of expressive

rights — so long as such regulation of speech is content-neutral and does not favor one person's

or cause's views over another.  McCullen v. Coakley, 135 S. Ct. 2518, 2519 (2014); Ward v.

Rock Against Racism, 491 U.S. 781, 791 (1989); Clark v. Cmty. for Creative Non-Violence, 468

U.S. 288, 293 (1984).  As the Chief Justice recently noted:

> [T]he guiding First Amendment principle that the "government has
> no power to restrict expression because of its message, its ideas, its
> subject matter, or its content" applies with full force in a traditional
> public forum.  Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95
> (1972).  As a general rule, in such a forum the government may not
> "selectively . . . shield the public from some kinds of speech on the

ground that they are more offensive than others." Erznoznik v. Jacksonville, 422 U.S. 205, 209 (1975).

McCullen v. Coakley, 134 S. Ct. at 2519.

Regulations that are unrelated to the content or viewpoint of speech are subject to what has been termed an intermediate level of scrutiny because, generally, "they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994); see Clark v. Cmty. for Creative Non-Violence, 468 U.S. at 293-94. So long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication," the government may enforce reasonable time, place and manner restrictions. United States v. Grace, 461 U.S. at 177 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45); see also Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989); White House Vigil for the ERA Comm. v. Clark, 746 F.2d at 1527.[6]

By contrast, when the restriction on speech is not content-*neutral*, but content-*based*, such a restriction on political speech in a public forum is "subjected to the most

---

[6] "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. at 791. "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" Id. (internal citations omitted); see also United States v. O'Brien, 391 U.S. 367, 377 (1968).

The "'narrowly tailored' portion of the time place or manner test requires that there be a *real nexus* between the challenged regulation and the significant governmental interest sought to be served by the regulation." Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d at 389 (emphasis in original). "It is not enough that a regulation is facially reasonable, or that a governmental interest is significant; rather, it must be shown that a reasonable regulation is narrowly tailored *to substantially serve* a significant governmental interest." Id. (emphasis in original). To put it another way, there must be "a close fit between ends and means." McCullen v. Coakley, 134 S. Ct. at 2534.

exacting scrutiny" – so-called strict scrutiny.  Boos v. Barry, 485 U.S. 312, 321 (1988); see also Reed v. Town of Gilbert, 135 S. Ct. 2218, 2231 (2015); Mahoney v. Babbitt, 105 F.3d at 1455. Because "the government may not regulate speech based on its substantive content or the message it conveys," Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828 (1995); see Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 578 (1995); Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 135 (1992), content-based laws – "those that target speech based on communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 135 S. Ct. at 2226; see Boos v. Barry, 485 U.S. at 321-22; United States v. Grace, 461 U.S. at 177.

Viewpoint discrimination is a subset of content-based discrimination, a more "egregious form of content discrimination." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. at 829.  Both under the First Amendment and under the Equal Protection Clause, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . [G]overnment must afford all points of view an equal opportunity to be heard." Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 96 (1972) (footnote omitted) (holding that the government may not allow picketing on one topic while prohibiting it on others).  The courts "will not tolerate any attempt to discriminate among protestors on the basis of viewpoint or subject matter." White House Vigil for the ERA Comm. v. Clark, 746 F.2d at 1527.

### C.  Permitting System

In order to regulate competing uses of public forums, the government may impose a permit requirement on those wishing to hold a march, parade, or rally, or otherwise use the

parks and streets for expressive activity.  Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. at

130.  As a prior restraint on speech, however, any permitting scheme must meet certain

constitutional requirements.  It may not delegate overly broad licensing discretion to a

government official.  Furthermore, consistent with the principles just discussed, any permitting

scheme controlling the time, place, and manner of speech "must not be based on the content of

the message, must be narrowly tailored to serve a significant governmental interest, and must

leave open ample alternatives for communication."  Id.; see United States v. Grace, 461 U.S. at

177.  A "government regulation that allows arbitrary application is inherently inconsistent with a

valid time, place, and manner regulation because such discretion has the potential for becoming a

means of suppressing a particular point of view.  To curtail that risk, a law subjecting the

exercise of First Amendment freedoms to the prior restraint of a license must contain narrow,

objective, and definite standards to guide the licensing authority."  Forsyth Cty., Ga. v.

Nationalist Movement, 505 U.S. at 130-31 (internal citations and quotations omitted); see also

Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002) ("Where the licensing official enjoys

unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he

will favor or disfavor speech based on its content.").  The government "bears the burden of

justifying its [permitting] restrictions."  Bd. of Trustees of the State Univ. of N.Y. v. Fox, 492

U.S. 469, 480 (1989).

   Both this Court and the District of Columbia Circuit have previously had occasion

to consider various aspects of NPS permitting regulations governing federal parklands within the

capital city, particularly when those regulations have conflicted with the rights of citizens to

engage in political speech.  A previous iteration of the NPS regulations exempted National Park

Service sponsored events entirely – in that case, the Christmas Pageant for Peace, a so-called

"National Celebration Event" – from the permitting rules governing non-NPS events.  The

district court enjoined NPS from refusing permission to erect a temporary anti-war display on the

Ellipse by Women Strike for Peace, and the court of appeals affirmed.  Judge Wright observed:

> [T]he Government's regulations do discriminate between applicants
> on a constitutionally unacceptable basis. Whereas all other events
> require permits before they can be held, NPS events are permitted
> to proceed without a permit. Furthermore, NPS events – unlike all
> other events – are permitted to preempt an entire park area. Taken
> together, these two provisions mean that the Government-sponsored
> displays are always given preference over other displays which do
> not meet with the approval of Government officials. Such
> discrimination cannot be analogized to evenhanded enforcement of
> the rules of the road. It constitutes instead the kind of blatant
> government censorship which the framers of the First Amendment
> intended to outlaw forever.

Women Strike for Peace v. Morton, 472 F.2d 1273, 1293 (D.C. Cir. 1972) (footnotes omitted)

(Wright, J., concurring in a per curiam affirmance of the district court's order granting injunctive

relief to the plaintiffs).  Under Women Strike for Peace, therefore, and as this Court held in

ANSWER II, 537 F. Supp. 2d at 197, NPS must subject itself to the same permitting regulations

as other applicants for permits.  See also A Quaker Action Group v. Morton, 516 F.2d 717, 727

(D.C. Cir. 1975) ("Quaker Action IV") (NPS permitting system must be "enforced uniformly and

without discrimination").

    Since the sidewalks abutting Pennsylvania Avenue became federal lands in 1996,

members of this Court have been called upon to apply these principles when faced with disputes

about the rights of protesters on Inauguration Day — every four years, without fail.  See, e.g.,

Mahoney v. Babbitt, Civil Action No. 96-2827 (Greene, J.) (1997 Inauguration of President

William Jefferson Clinton); Int'l Action Ctr. v. United States, Civil Action No. 01-0072

(Kessler, J.) (2001 Inauguration of President George W. Bush); A.N.S.W.E.R. Coalition v.

Norton, Civil Action No. 05-0071 (Friedman, J.) (the case at bar, 2005 Inauguration of President

George W. Bush).  In response to this Court's decision of March 20, 2008, that NPS may not reserve all of the sidewalks on Pennsylvania Avenue for PIC, <u>ANSWER II</u>, 537 F. Supp. 2d at 205, the NPS amended its regulations, expressly eliminating any ability to exempt itself from generally applicable permitting regulations or to provide itself with application priority.  <u>See</u> <u>ANSWER III</u>, 2012 WL 8667570, at *3-5.  While NPS's regulations have, since 1980, set-aside the White House sidewalks and three-quarters of Lafayette Park for the exclusive use of PIC during the period surrounding the Inauguration, the amended regulations expand the set-aside to include portions of Freedom Plaza and approximately the final seven blocks of Pennsylvania Avenue along the parade route.  <u>Id</u>. at *4-5.

The question that remains in this case, aside from ANSWER's challenge to the Secret Service's ban on supports for signs, is how much, if any, of the Pennsylvania Avenue sidewalks and Freedom Plaza can constitutionally be reserved for the exclusive use of PIC and its ticketed guests on Inauguration Day, and how much must be left open so that any peaceful demonstrators may be granted a permit regardless of viewpoint or content.

## IV.  ANALYSIS

### A.  *Count I – Permitting Violations*

NPS argues that Count I should be dismissed because the regulations have been amended and PIC no longer is exempted from the permitting system; if the policy no longer exists, the claim is moot.  In response, ANSWER correctly maintains that this portion of defendants' motion is not moot but already has been decided in plaintiff's favor:  this Court granted summary judgment to plaintiff on Count I and entered the requested injunction on March 20, 2008.  <u>See</u> <u>ANSWER II</u>, 537 F. Supp. 2d at 204.  Defendants did not appeal the Court's decision.  NPS' motion to dismiss Count I therefore will be denied.

*B. Counts III and IV: Set-Aside of Pennsylvania Avenue and Freedom Plaza*

1. The Regulatory Set-Aside is Content-Neutral and Therefore Subject to Intermediate Scrutiny

Freedom Plaza and the Pennsylvania Avenue sidewalks are traditional public forums.  Thus, as defendants concede, "the government ordinarily may not regulate speech based on the content of the message – i.e., the subject matter – conveyed."  NPS's Mot. at 15 (citing Police Dep't of Chicago v. Mosley, 408 U.S. at 96); ANSWER II, 537 F. Supp. 2d at 195). Defendants argue that the regulations are content-neutral, and therefore are subject only to intermediate scrutiny, because "until an election is held the views of the incoming administration are completely unknown."  NPS Mot. at 17.[7]  By contrast, ANSWER maintains that the amended regulations are content and viewpoint-based; they favor the incoming Presidential Administration, the President-elect's views and policies, or the government of the United States, whose policies ANSWER intends to protest no matter which party's candidate is elected president.  Pl. Opp. & Cross-Mot. re Counts III & IV at 13-17.  ANSWER therefore argues that the Court must determine if the regulations pass muster under a strict scrutiny analysis, not intermediate scrutiny.  Id. at 19.

To determine whether the regulatory set-aside constitutes content or viewpoint-based discrimination, however, the Court first must answer a threshold question: does PIC's speech in the set-aside areas at the Inaugural Parade constitute government speech or private speech?  As the Fourth Circuit has explained:

> This threshold inquiry is generally dispositive in viewpoint
> discrimination cases because of three common assumptions: first,

---

[7]        As an initial matter, the Court rejects defendants' related argument that, because ANSWER does not challenge the long-standing regulatory set-aside of the White House sidewalks and Lafayette Park, ANSWER has "concede[d] that PIC may in fact be given some kind of priority use of federal parkland for the Inauguration."  NPS Mot. at 20-21.  That separate regulatory set-aside is not at issue in this case and plaintiff has made no such concession.

> that all speech is either government speech or private speech; second, that when the government speaks for itself and is not regulating the speech of others, it may discriminate based on viewpoint; and third, that the government may not discriminate based on viewpoint when it regulates private speech.

Planned Parenthood of S.C. Inc. v. Rose, 361 F.3d 786, 792 (4th Cir. 2004).  "When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2245 (2015); see Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 833 ("[W]hen the State is the speaker, it may make content-based choices.").  The government may "favor its own expression" and is "free to establish venues for the exclusive expression of its own viewpoint." Oberwetter v. Hilliard, 639 F.3d 545, 553-54 (D.C. Cir. 2011).  In short, "[t]he First Amendment's Free Speech Clause does not apply to the government as communicator."  People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23, 30-31 (D.C. Cir. 2005).

It follows that if PIC's speech constitutes government speech, then the regulatory set-aside of 16% of the parade route for the government, and the restriction for all others to 84% of the route, does not discriminate among private speakers based on content or viewpoint.  See Pleasant Grove City v. Summum, 555 U.S. 460, 470-73 (2009) (holding that when the government erects a monument on public property, it is not obligated to allow other monuments expressing alternative viewpoints); People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d at 30 ("No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must — if he requests — be allowed to have a float of his own.").  And if favoring the government's own speech does not constitute content or viewpoint discrimination, intermediate scrutiny — not strict scrutiny — applies when evaluating under the First Amendment any restrictions by the government on the private speech of others. See supra at 12-13.

NPS conceded at oral argument that PIC is not a governmental entity.  Rather, it is "the privately funded, non-profit, non-governmental, partisan organization that represents the interests of the President-Elect."  AUDREY CELESTE CRANE-HIRSCH, CONG. RESEARCH SERV., R42891, THE PRESIDENTIAL INAUGURATION: BASIC FACTS AND INFORMATION 2 (January 9, 2013) [Dkt. No. 183-9] [hereinafter Crane-Hirsch Report].[8]  That fact does not end the inquiry, however, as speech ostensibly made by a private actor still may constitute government speech. See Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. at 2251 ("The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."); Pleasant Grove City v. Summum, 555 U.S. at 472-73 (holding that city display of privately donated monuments in public park constituted government speech because city "effectively controlled" message conveyed by its selection of monuments); Johanns v. Livestock Marketing Ass'n, 544 U.S. 550, 560 & n.4, 562 (2005) (declining to decide whether the entity responsible for the advertising at issue was governmental or non-governmental because "[t]he message . . . [was] effectively controlled by the Federal Government itself").  The Court therefore must determine whether PIC's speech constitutes government speech.

Complicating the analysis of this issue, as Judge Mehta recently noted, is the fact that "[t]he government-speech doctrine is a relatively recent development in federal case law and the test to determine if something is an example of government speech has not been clearly

---

[8]      See also Saffron v. Wilson, 481 F. Supp. 228, 235 (D.D.C. 1979) ("The Inaugural parade in 1973 was an event organized, financed and staged by a private organization called the 1973 Inaugural Committee."); U.S. Office of Government Ethics, Legal Advisory 12-10: Presidential Inaugural Events (Dec. 20, 2012) ("[N]ote that the official Presidential Inaugural Committee (PIC) is not a political organization but rather a 501(c)(4) organization."); Fed. Election Commission Advisory Opinion 1980-144 ("[T]he Committee is a District of Columbia non-profit corporation organized pursuant to 36 U.S.C. 721 et. seq.").

established."  Nat'l Ass'n of Manufacturers v. Perez, 103 F. Supp. 3d 7, 15 n.4 (D.D.C. 2015).

Although the Supreme Court has not articulated a precise test for distinguishing government

speech from private speech, the Court recently identified three relevant factors in Walker v.

Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2248-50 (2015), and Pleasant

Grove City v. Summum, 555 U.S. at 470-73:  (1) the history of the speech at issue; (2) a

reasonable observer's perception of the speaker; and (3) control and final authority over the

content of the message.  Applying these factors, the five Justice majority in Walker held that

specialty license plates issued by the Texas Department of Motor Vehicles constituted

government speech, concluding that: (1) license plates "long have communicated messages from

the States;" (2) license plates "are often closely identified in the public mind with the State,"

such that reasonable observers "interpret them as conveying some message on the [State's]

behalf;" and (3) Texas has "effectively controlled" the content of the messages contained on the

license plates because it retained final approval authority.  135 S. Ct. 2248-49 (quoting Pleasant

Grove City v. Summum, 555 U.S. at 470, 472, 473).

        Although the Court recognizes that this is a close and novel question, it concludes

that PIC's speech constitutes government speech after considering the three factors identified by

the Supreme Court in Walker and Summum.  First, since the founding of this nation, the United

States government has used the Presidential Inauguration Ceremony and its attendant

celebrations to "speak to the public."  See Pleasant Grove City v. Summum, 555 U.S. at 470.

Going back to George Washington's Inaugural Address at the first Inauguration in 1789 and the

first organized Inaugural Parade in 1809 at the Inauguration of James Madison, the Inauguration

Ceremony and the Parade are used every four years as a platform for the government to

communicate with the public.  INAUGURAL PARADE, JOINT CONGRESSIONAL COMMITTEE ON

INAUGURAL CEREMONIES (Jan. 13, 2015), http://www.inaugural.senate.gov/days-events/days-event/inaugural-address.  Second, the Inauguration Ceremony and Parade are "closely identified in the public mind with" the United States government.  Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. at 2248 (quoting Pleasant Grove City v. Summum, 555 U.S. at 472).  Indeed, it is difficult to conceive of speech more closely associated with the government than the oath-of-office of the Chief Executive of the United States and the celebration of his or her Inauguration.  "[A] reasonable and fully informed observer would understand [such] expression to be government speech, as distinct from private speech[.]" Pleasant Grove City v. Summum, 555 U.S. at 487 (Souter, J., concurring).[9]

The third factor identified by the Supreme Court in Walker and Summum is not so cut-and-dried.  While the involvement of PIC in planning the Inauguration and Inaugural Parade certainly is not fatal to the government speech paradigm, Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. at 2247, there is no direct evidence in the record as to the extent to which, if any, the government retains control and final authority over PIC's expressive activities — such as the signs, flags, or banners displayed — within the set-aside areas at the Inaugural Parade.  What is clear is that PIC ultimately is "in charge of the Presidential inaugural

---

[9]    Indeed, even ANSWER itself, throughout its briefs, characterizes PIC as representing the government, even going so far at times as to label PIC's speech 'government speech.'  See, e.g., Pl. Opp. & Cross-Mot. re Counts III and IV at 2 (PIC is "the advocacy and fundraising vehicle of the government."); id. at 11 (referring to the set-aside as a "permanent ban . . . in favor of the government's supporters and speech"); id. at 13 (describing PIC as "represent[ing] [the] government's viewpoint" and the set-aside as a "favored reservation of public forum space for government speech"); id. at 14 ("government sponsored expression"); id. at 15 (set-aside is "viewpoint-based discrimination in favor of government speech"); id. at 18 (PIC "represent[s] the viewpoint of the government" and "its expressive activities are co-sponsored by the government."); id. at 27 ("The Inauguration will go on regardless of reserved PIC bleacher seats for government speech."); Pl. Reply re Counts III and IV at 3 (describing PIC's speech as "that of the government"); id. at 4 ("PIC uses these areas to express the viewpoint of the government"); id. at 23 ("the government's speech").

ceremony and functions and activities connected with the ceremony."  36 U.S.C. § 501(1).  "The

Presidential Inaugural Committee . . . organizes, plans, and executes most of the inaugural

celebration activities, including the . . . inaugural parade" and even "is responsible for choosing

the participants."  Crane-Hirsch Report at 5.

On the other hand, PIC is controlled by the President-Elect, see Crane-Hirsch

Report at 2, who becomes the Chief Executive of the United States government upon taking the

oath-of-office at noon on Inauguration Day — hours before the Inaugural Parade begins and

ANSWER and others wish to protest in the set-aside areas of Freedom Plaza and the seven-block

stretch of Pennsylvania Avenue.[10]  And, although PIC is "in charge" of the Parade, the United

States government contributes significant public funds, in addition to the private funding raised

by PIC.  See id. at 2.[11]

Taken together, the three considerations identified in Walker and Summum lead

the Court to conclude that PIC's speech constitutes government speech.  Although the final, and

perhaps most important, factor — control over content — arguably weighs to some extent

against finding government speech, the first two factors weigh strongly in favor.  The Inaugural

---

[10]     The oath-of-office is administered at noon on Inauguration Day, US. CONST. amend. XX, § 1, while the Inaugural Parade takes place "[a]fter the conclusion of the Inaugural Ceremonies and the luncheon."  INAUGURAL PARADE, JOINT CONGRESSIONAL COMMITTEE ON INAUGURAL CEREMONIES (Jan. 13, 2015), http://www.inaugural.senate.gov/days-events/days-event/inaugural-address.  In 2013, for example, the Parade was scheduled to commence at 2:30 pm.  INAUGURATION SCHEDULE OF EVENTS, DOD SUPPORT TO THE 57TH PRESIDENTIAL INAUGURATION, JOINT TASK FORCE – NATIONAL CAPITAL REGION (Jan. 13, 2015), http://inauguralsupport.mdw.army.mil/public-information/schedule-of-events.

[11]     For the 2009 Inauguration, $3.6 million was appropriated to the Architect of the Capitol for "Capitol building inaugural support," $1.24 million to the Joint Congressional Committee on Inaugural Ceremonies, and $2 million to NPS "for security and visitor safety activities related to the Presidential Inaugural Ceremonies."  Crane-Hirsch Report at 2.  The Joint Task Force-Armed Forces Inaugural Committee and the Department of Defense further reported spending $21.6 million for "military personnel, operation and maintenance, and procurement" related to the Inaugural Celebration.  Id.

Parade has long served as a very public platform for the speech of the Administration of the new

President — he or she, not PIC, ultimately "sets the overall message to be communicated."

Johanns v. Livestock Marketing Ass'n, 543 U.S. at 562.  And reasonable observers would

readily identify the Parade and the activities surrounding it, including the official viewing stands

for the President's ticketed guests, as representing the viewpoint of the United States

government.  Moreover, just as with speech emanating directly from a governmental entity

— perhaps even more so — PIC's speech is "ultimately 'accountable to the electorate and the

political process for its advocacy,'" Pleasant Grove City v. Summum, 555 U.S. at 468, because

PIC "is directly responsible to the new elected President."  Crane-Hirsch Report at 5.[12]

Of course, this conclusion — that PIC's speech is government speech — "does

not mean that the [regulatory set-aside] do[es] not also implicate the free speech rights of private

persons."  Walker v. Texas Div., Sons of Confederate Veterans, Inc., 135 S. Ct. at 2252.

Although, for the reasons just discussed, PIC's speech itself *is not* subject to First Amendment

scrutiny, the restriction of the expressive activities of ANSWER and all other private persons and

entities to limited portions of the parade route and Freedom Plaza *is*.  See Pleasant Grove City v.

Summum, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private

---

[12]    For these reasons, ANSWER's bare-bones Equal Protection Clause argument also fails because PIC is not "similarly situated" to plaintiff.  Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 215 (D.C. Cir. 2013) ("To prevail on an equal protection claim, the plaintiff must show that the government has treated it differently from a similarly situated party and that the government's explanation for the differing treatment 'does not satisfy the relevant level of scrutiny.'") (quoting Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1102 (D.C. Cir. 2005)).  Moreover, as discussed further below, "in a case like this one, in which there is no doubt that the interests invoked in support of the challenged legislative classification are legitimate, and no doubt that the classification was designed to vindicate those interests rather than disfavor a particular speaker or viewpoint, the challengers 'can fare no better under the Equal Protection Clause than under the First Amendment itself.'"  Wagner v. FEC, 793 F.3d 1, 33 (D.C. Cir. 2015) (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 55 n.4 (1986)).

speech; it does not regulate government speech.").  Because the regulatory set-asides for the government of portions of the sidewalks of Pennsylvania Avenue and Freedom Plaza are content and viewpoint-neutral restrictions on private speech, however, the regulations are subject only to an intermediate scrutiny analysis.  Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d 4, 12 (D.C. Cir. 2008) (citing United States v. O'Brien, 391 U.S. 367, 377 (1968)).  The regulatory set-aside therefore is valid if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  Id.; see also Turner Broad. Sys., Inc. v. FCC, 512 U.S. at 662.  The regulation also must leave open ample alternative channels for communication.  See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

As ANSWER has made no argument challenging the government's constitutional power, and because the Court has concluded that the restriction is content-neutral, the only issues that remain are:  (1) does the regulatory set-aside further an important or substantial government interest; (2) is the restriction on First Amendment freedoms substantially no greater than necessary to further that interest; and (3) are there ample alternative channels available for communication?  The Court concludes that the regulation satisfies this standard.

2.  The Regulation is Narrowly Tailored to Serve Significant Government Interests

A regulation is narrowly tailored when it does not "burden substantially more speech than is necessary to further the government's interests."  Ward v. Rock Against Racism, 491 U.S. at 799.  Further, a "narrowly tailored regulation need not be the least restrictive or least intrusive means of serving the government's content-neutral interests."  American Library Ass'n

v. Reno, 33 F.3d 78, 88 (D.C. Cir. 1994); see McCullen v. Coakley, 134 S. Ct. at 2535; Turner

Broad. Sys., Inc. v. FCC, 512 U.S. at 662; Clark v. Cmty. for Creative Non-Violence, 468 U.S. at

288, 299.  Rather, the regulation is valid "if a substantial portion of the burden it imposes

furthers the Government's interest, even though a less intrusive alternative might also exist."

American Library Ass'n v. Reno m 33 F.3d at 88.

        NPS argues that, as this Court has noted, PIC is "recognized by statute as 'the

committee appointed by the President-elect to be in charge of the Presidential inaugural

ceremony and functions and activities connected with the ceremony,'" ANSWER III, 2012 WL

8667570, at *1 (quoting Newdow v. Roberts, 603 F.3d 1002, 1006 (D.C. Cir. 2010)), and the

government thus has a significant interest in "assist[ing] PIC in meeting its statutory duties to

plan inauguration ceremonies and activities."  NPS Mot. at 21; see NPS Reply re Counts III and

IV at 23-27.

        The Court agrees that the government has a significant and important interest in

planning and executing the Inaugural Parade, and that the regulation is narrowly tailored to serve

that interest.  The government's interest is undoubtedly significant — the Inaugural Parade is an

event followed worldwide that celebrates "the observance of the inauguration of the Chief

Executive of the United States."  Mahoney v. Babbitt, 105 F.3d 1452, 1458 (D.C. Cir. 1997).

Inauguration Day has been recognized by Congress as a federal holiday.  Crane-Hirsch Report

at 1.  And Congress expressly has placed PIC "in charge of the Presidential inaugural ceremony

and functions and activities connected with the ceremony."  36 U.S.C. § 501(1).  To further the

government's interest in PIC fulfilling that statutory mandate, NPS has reserved approximately

16% of the parade route for PIC's exclusive use for facilities directly related to effective

execution of the Parade.  The reserved spaces are used to provide reasonable viewing areas for

the President's ticketed guests — a substantial source of PIC's private fundraising — facilities

for the media outlets from across the globe that cover the Inaugural Ceremony and Parade, and

portable toilets for the public.  That modest restriction of the space available to the general public

is narrowly tailored and cannot be said to burden "substantially more speech than is necessary"

to further the government's interest.  <u>Ward v. Rock Against Racism</u>, 491 U.S. at 799.

### 3. The Regulation Leaves Open Ample Alternative Channels for Communication

As noted, the regulatory set-aside reserves only 16% of the Inaugural Parade

route, leaving the vast majority of the Pennsylvania Avenue sidewalks and portions of Freedom

Plaza open to ANSWER and the general public.  At past inaugurations, ANSWER has been

granted use of several different spaces, including John Marshall Park and a small portion of

Freedom Plaza.  NPS Mot. at 27-78 (citing Owen Decl. ¶¶ 20, 23, 25).  Although ANSWER

argues that "Freedom Plaza is decidedly unique," Pl. Opp. and Cross-Mot. re Counts III and IV

at 38, it has cited no case law supporting the proposition that ANSWER is entitled to protest at

the specific location that it believes will be most effective.  <u>Compare</u> <u>Heffron v. Int'l Soc'y for</u>

<u>Krishna Consciousness, Inc.</u>, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not

guarantee the right to communicate one's views at all times and places or in any manner that

may be desired.").  ANSWER's argument that there is "no other suitable or alternative space

along the parade route for its intended rally," Pl. Opp. and Cross-Mot. re Counts III and IV at 10,

similarly is unpersuasive — ANSWER has engaged in expressive activity at every Inaugural

Parade since 2005, previously has received a permit for space in the unreserved portions of

Freedom Plaza, and itself has touted its demonstrations as a success.  <u>See</u> NPS Reply, Ex. 1.

ANSWER and the general public retain access to 84% of the parade route for their expressive

activities.  The Court therefore easily concludes that the regulatory set-aside provides ample alternative channels for ANSWER's communication at the Inaugural Parade.

### C.  Count II – Sign Supports

#### 1.  The Sign Support Ban is Content-Neutral and Subject to Intermediate Scrutiny

In 2001, the government first established a checkpoint and perimeter system restricting access to the public spaces along the Presidential Inaugural Parade route.  Pl. Opp. & Cross-Mot. re Count II at 3.  At that Inaugural Parade, the Secret Service permitted wooden sign supports with cross-sectioned dimensions no greater than three-quarters of an inch by three-quarters of an inch.  Id.  Beginning in 2005, however, the Secret Service banned all supports for signs and placards from the Presidential Inaugural Parade route.  Secret Serv. Mot. at 2.  The Secret Service states that the heightened security measures were instituted in response to the terrorist attack on September 11, 2001, law enforcement experience in dealing with disruptions at other demonstrations and specifically the 2001 Inauguration, and to ensure efficient access through Pennsylvania Avenue checkpoints.  Id.

The Secret Service justifies its ban on sign supports as a precautionary measure established to protect the President, Vice President, other federal officials, law enforcement officers, and parade attendees.  The Secret Service maintains that it placed restrictions on the sign supports due to safety concerns: the supports can be used as weapons once detached from the sign or they can be used to carry weapons within.  Secret Serv. Mot. at 2; see also Coyer Dec. ¶¶ 15-17 & Attachment 2.  The government thus claims that the ban on sign supports is content-neutral because the restriction applies to "all demonstrators, regardless of their views, *to PIC ticket-holders* and to members of the public."  Secret Serv. Mot. at 15 (emphasis added). ANSWER responds that the Secret Service prohibits supports for lawful expressive signs and

placards, but allows supports for non-expressive functions such as "metal supports for rain protection (i.e., umbrellas), supports for commercial restaurant signs, supports for cameras (i.e., large heavy metal tripods), supports for cords used to create lanes (i.e., heavy metal stanchions), supports for sitting (i.e., metal legged stools), metal supports for trash bags, supports for infants (i.e., strollers)."  Pl. Reply re Count II at 4.  Further, ANSWER disputes the Secret Service's justification and contends that the ban on sign supports is based on their function as a means of holding up political signs for extended periods of time, not for their physicality as a potentially dangerous weapon or weapon concealer.  Id. at 5.

The Court agrees with the Secret Service that the ban on sign supports is content-neutral — no evidence in the record indicates that it was adopted because of disagreement with any particular message conveyed or the content of speech.  It applies to all sign-holders no matter who they are, what organization they represent, or the views they are expressing.  The sign support ban therefore is subject to intermediate scrutiny.  See Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d at 12 (citing United States v. O'Brien, 391 U.S. at 377, 388).  The Court is satisfied that the Secret Service's ban on sign supports at the Inaugural celebration meets the intermediate scrutiny standard.[13]

2.  The Sign Support Ban is Narrowly Tailored to Serve a Significant Government Interest

The Secret Service argues that its restriction on sign supports prohibits only the items that raise safety and security concerns or that would require careful examination that would

---

[13]      The Secret Service argues that supports for signs and placards merely facilitate conduct and therefore are not entitled to the same level of First Amendment protection accorded to pure speech.  See White House Vigil for the ERA Comm. v. Clark 746 F.2d at 1540.  The Court need not address this argument, however, because it concludes that the regulation readily satisfies intermediate scrutiny.  See infra at 30-32.

impede the efficient flow of people through the checkpoints.  Secret Serv. Mot. at 15.  It asserts

that the ban ensures prompt admission through the security checkpoints because agents may

check for banned item categories that have been determined to raise security concerns, rather

than take time to measure items against size restrictions.  Id.  The Secret Service thus maintains

that the restrictions on sign supports are narrowly tailored and serve a substantial government

interest in protecting the President, Vice President, other federal officials, law enforcement, and

the general public at the Inaugural Parade.  Id.  ANSWER contends that the Secret Service did

not narrowly tailor its ban on sign supports because attendees can bring in larger and allegedly

more dangerous items such as umbrellas and tripods.  Pl. Opp. & Cross-Mot. re Count II at 31.

Further, ANSWER argues that the Secret Service has failed to present substantial evidence that

its hypothetical risks and concerns cannot be addressed through less restrictive means, such as

restrictions on size and composition for sign supports, as distinguished from an outright ban.  Id.

at 27, 31.

   The Court is persuaded that the sign support ban is narrowly tailored to the

government's substantial interest in ensuring safety and managing the flow of pedestrian traffic.

The evidence proffered by the government demonstrates that sticks have been used by protesters

around the world "to inflict injury on law enforcement officers or on other demonstrators."

Coyer Decl. ¶ 16; see also id. ¶ 17; Callahan Dep. at 41-42.  And the Secret Service has not only

banned sign supports but also other items — including sticks, laser pointers, coolers, backpacks,

and folding chairs — that it reasonably believes could be used as weapons or to conceal

weapons.  Coyer Decl. ¶ 16 & Ex. 1 (Secret Service letter describing the prohibited categories of

items).  The government's evidence also demonstrates the risk of imposing the size restrictions

advanced by ANSWER — in 2001, the only Inaugural Parade at which the Secret Service

allowed some sign supports, "individuals were able to burst through a checkpoint due in part to the number of people present at the checkpoint waiting to be screened." Id. ¶ 19; see Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d at 389; White House Vigil for the ERA Comm. v. Clark, 746 F.2d at 1531.[14]   By contrast, plaintiff has pointed to no evidence that umbrellas, tripods or the other various items — the items it cites as comparable to sign supports but that are allowed by the Secret Service — have ever been used as weapons or to conceal weapons in such circumstances.[15]   Nor has plaintiff offered evidence that a size restriction would allow for efficient security screening despite the Secret Service's experience to the contrary.

Although ANSWER contends that other less restrictive security measures, such as pre-screening in advance, could permit sign supports without security delays, a regulation does not fail to satisfy intermediate scrutiny simply "because there are less speech-restrictive alternatives that could have satisfied the Government interest." Clark v. Cmty. for Creative Non-Violence, 468 U.S. at 299; see id. at 288; McCullen v. Coakley, 134 S. Ct. at 2535; White

---

[14]   For this reason, this case is distinguishable from Edwards v. Coeur d'Alene, 262 F.3d 856 (9th Cir. 2001).  In Edwards, the Ninth Circuit concluded that a complete ban on sign supports "burden[ed] substantially more speech than is necessary" because the government had offered "little empirical evidence" and "little factual support" that less drastic alternatives were not feasible.  Id. at 866, 864-65.  That case, however, did not involve security checkpoints or demonstrated problems with efficient security screening when "regulating the length, width, composition, and sharpness of sign supports." Id.  The Court concludes that the less-restrictive alternative endorsed by the Ninth Circuit in Edwards is not feasible in the very different context of a Presidential Inauguration and Inaugural Parade.  Moreover, Edwards was decided before September 11, 2011, and did not involve an event attended by countless high ranking U.S. government officials, including the President of the United States.  The security concerns in this case therefore are significantly greater than those facing the City of Coeur d'Alene in Edwards. The Secret Service's ban on sign supports burdens substantially no more speech than is necessary.

[15]   The Secret Service also has explained its fear that supports for signs and placards can be used to conceal weapons, although it has not cited specific examples of this happening. Coyer Decl. ¶ 17; see Secret Serv. Opp. & Reply at 10.

House Vigil for the ERA Comm. v. Clark, 746 F.2d at 1531-32 (under intermediate scrutiny, "[a] court may not require that the agency adopt 'the least restrictive alternative.'").  "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ward v. Rock Against Racism, 491 U.S. at 799.  "At its heart, the task of devising a security scheme is inherently a predictive process, requiring planners to make assumptions as to what threats there are, how likely they are to occur, and what harm might result if they do." American Civil Liberties Union of Colo. v. City and Cty. of Denver, 569 F. Supp. 2d 1142, 1175-76 (D. Colo. 2008); accord White House Vigil for the ERA Comm. v. Clark, 746 F.2d at 1531 ("A Court may not require that the agency adopt the 'least restrictive alternative,' thereby substituting its judgment for that of the regulators."); Quaker Action IV, 516 F.2d at 731.  The Court therefore is satisfied that the Secret Service's ban on sign supports burdens substantially no more speech than necessary to further the government's substantial interest in an efficient and effective security screening process at the Inaugural Parade.

   3.   The Sign Support Ban Leaves Open Ample Alternative Channels for Communication

             Having concluded that the ban on sign supports is narrowly tailored, the Court next must consider whether the prohibition leaves open ample alternative channels of communication.  See Clark v. Cmty. for Creative Non-Violence, 468 U.S. at 293; see also Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. at 130; ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 958 (D.C. Cir. 1995).  The Court concludes that it does.  ANSWER is free to hold signs or banners by hand, communicate orally, or hand out leaflets.  See Mahoney v. Doe, 642 F.3d 1112, 1119 (D.C. Cir. 2011) ("[Plaintiff] was free to announce any 'verbal' message he chose.  And, [plaintiff] could depict visual messages on signs, banners, and leaflets.

32

And it has done so at every Inauguration since 2005.  Thus, ample alternative channels of communication existed.").

       The Court disagrees with the Ninth Circuit's conclusion in <u>Edwards v. Coeur d'Alene</u> that no ample alternative channels of communication exist when sign supports are banned because "there is no other effective and economical way for an individual to communicate his or her message to a broad audience during a parade or public assembly than to attach a handle to his sign to hoist it in the air."  262 F.3d at 867.  Although, to be sure, a sign support is far more effective than holding up signs by hand, shouting, or passing out leaflets, the ban does not, as the Ninth Circuit concluded, "effectively prevent[] [a speaker] from reaching his intended audience."  <u>Id</u>.  ANSWER itself has touted its prior demonstrations at Inaugurations as a success, <u>see</u> Secret Serv. Mot., Ex. 2, and demonstrators retain the ability to "reach the minds of willing listeners" through an "opportunity to win their attention."  <u>Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.</u>, 452 U.S. at 655 (internal quotation marks and citations omitted); <u>see</u> <u>also</u> Secret Serv. Mot., Ex. 2 (stating that ANSWER's "antiwar mass rally . . . was broadcast live on C-Span 2 for 4 hours and 25 minutes" and containing photographs showing demonstrators' signs to be clearly visible to television cameras).

## V.  CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss Count I and grants summary judgment to defendants on Counts II, III, and IV.  It also grants plaintiff's motion to strike.  An Order consistent with this Opinion shall issue this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  January 28, 2016